[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 441 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 442 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 443 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 444 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 446 
It is insisted that the act, under which the bonds in question purport to have been issued, is unconstitutional and void, because it contained the provision that the supervisor and commissioners appointed therefor should have no power to do any of the acts authorized by it, unless the written assent of two-thirds of the taxpayers referred to therein had been obtained. This ground is untenable. The act took effect immediately on its passage. It conferred certain powers and rights on the several towns in the county of Cayuga which they did not previously possess, and which any such town could avail itself of, at its own election. That election was to be determined by the will of a certain class and number of resident persons taxed in such town, to be expressed by their written assent. Towns are sometimes called quasi corporations, and by the general law of the State prescribing the powers, duties and privileges of towns, chapter 11 of part 1 of the Revised Statutes (1 R.S., p. 337, § 1), "each town, as a body corporate, has capacity" to do certain acts and exercise certain prescribed powers; and it is declared that "no town shall possess or exercise any corporate powers, except such as are enumerated in this chapter, or shall be specially given by law, or shall be necessary to the exercise of the powers so enumerated or given." (§ 2.) *Page 447 
The power to borrow money and to subscribe for railroad stock was not one of the general powers possessed by towns, and the object of the act in question was to give it, upon certain terms and conditions prescribed. It was, in other words, a qualified and limited power; the same in principle as is conferred on a corporation to be exercised by and with the assent of its stockholders, or a portion of them, or upon an individual, with the previous approval of an officer of the court. It was not like the free school act, declared by this court to be unconstitutional in Barto v. Himrod (4 Seld., 483). The legislature, instead of declaring that to be a law, submitted it to the people of the whole State to determine, by a majority of the votes cast, whether it should or should not become a law. It was said by RUGGLES, Ch. J., in his opinion in that case, "In substance and reality the legislature propose the law. The people pass or reject it by a general vote. This is legislation by the people" (p. 488). He says further, after referring to the provisions vesting the legislative power in this State in the senate and assembly, that "the legislature had no power to make such submission" (p. 489), and WILLARD, J., in the same case, after taking substantially the same view of the question, says that "it is not denied that a law may be passed to take effect on the happening of a future event" (p. 495), and, after citing several examples, he adds, "The future event gives no additional efficacy to the law, but furnishes the occasion for the exercise of the power." * * "The law is complete when it has been passed through the forms prescribed by the Constitution, though its influence may not be felt until a subject has arisen upon which it can act" (p. 496).
In the case under consideration, the act, as before stated, by its terms took effect immediately; but parties to be affected by it were at liberty to accept the privileges granted, and incur the burdens and obligations it would impose as their interest or will should dictate: and any one or more of the towns, referred to therein, could take the benefit of it, and make it effective as to themselves, irrespective of the election or will of the others. It was therefore in all its material characteristics *Page 448 
entirely different from the school law; and the principle on which that law was held to be unconstitutional, has no application to this.
A law, having the same general object in view as the act we are examining, was passed about a year after it (Laws of 1853, chap. 283), by which the village of Rome was authorized to subscribe for and take and hold stock in a railroad and provide for the payment of it by issuing corporation bonds; but it was declared therein that "the board of trustees should have no power to make such subscription as is authorized in the first section of this act, nor to issue bonds or create any liability under this act, until it has been previously approved by two-thirds of all electors who shall have paid a tax on personal or real estate in said village, whose names shall appear regularly on the last village assessment-roll for the year next preceding the one in which the vote was taken:" and provision was made for determining the fact of such approval at a special election to be held for the purpose.
The constitutionality of that law was called in question in the case of The Bank of Rome v. The Village of Rome
(18 N.Y., 89). One of the grounds taken against its validity was, that it delegated the legislative power of this State to the voters of the village of Rome within the principles settled in Barto v.Himrod (supra). The provision above cited required the act itself to be approved by the electors before the power conferred by it could be exercised, and in that respect was distinguishable from the law under consideration, and more obnoxious to the objection suggested and urged against it; but this court held it to be constitutional and valid. JOHNSON, J., in giving the opinion of the court, concluded it by saying that the case was, in substance, only "a submission, to a vote of the parties interested, of the question whether or not they chose that the municipal corporation should subscribe to the railroad. In other words, the legislature did not compel the village to subscribe, but, creating by law the necessary machinery, left it to the taxpayers to determine the matter." *Page 449 
The principle decided in that case, and the considerations above suggested, lead us to the conclusion that the law in question is valid.
2d. The next, and an important, question presented is, whether it was incumbent on the plaintiff to show affirmatively that the assent of the taxpayers, required to be obtained by the said act, had in fact been obtained.
The towns of this State, as before remarked, have not the general power to borrow money, nor are their officers, in the exercise of their ordinary duties, authorized to issue bonds or any other evidence of indebtedness, in the name of the towns represented by them, for loans or other debts contracted or incurred on their behalf. Such power must therefore be specially conferred by a grant from the legislature; and there is no doubt that the grant may be made, upon such terms and under such limitations, restrictions and conditions as may be deemed necessary and proper for the protection of the taxpayers who are to pay the debt, on the one hand, and for the security of the lenders and creditors, on the other. The power may, therefore, be either general or qualified or special. That conferred in this case was of the latter character. The act expressly declares that the officers vested with the authority of borrowing the money on the faith and credit of their town, and performing the other acts therein specified, should "have no power to do any of the acts" authorized by the law until a railroad company had been organized for the purpose of constructing the railroad designated therein, and such written assent had been obtained, and, together with an affidavit of the character specified in the first section of the act, had been filed as is directed by that section. The legislature have thus seen fit to declare, in addition to other requirements and conditions imposed by the law, that taxpayers of the towns included within its operation should not be charged with the burden of the debt contemplated, except with the written assent of two-thirds of the resident persons taxed in said towns appearing on the assessment-roll thereof made next previous to the time such money was borrowed. Such assent was to be obtained by *Page 450 
the officers designated, or some or one of them, and filed in the office of the clerk of Cayuga county; and those officers had no power to borrow such money, nor do any of the other acts authorized, until such assent was so obtained and filed. That is an absolute prerequisite and a condition precedent. The requirement is clear and specific in its provisions; and the act affords a certain and unmistakable means of ascertaining whether it has been complied with. It refers to and adopts the assessment-roll of the town made next previous to the time when the money was to be borrowed, as the means of determining by whom the assent is to be given, and whether the requisite number of them has been obtained.
Evidence of such assent was therefore necessary as the basis and foundation of the right to contract the debt and execute the bonds in question. Such evidence was not given. It is expressly stated in the Case, as before remarked, that al though some of the signatures to the assents produced were genuine, the plaintiff "failed to prove that said signatures constituted or were the signatures of two-thirds of the resident persons taxed as appeared on any assessment-roll of said town whatever," but he appears to have relied on the affidavit, to which they were annexed, as sufficient evidence of that fact. The court below apparently have assented to that proposition, and its ruling and decision were evidently based on that view of the case. This, in our opinion, was an erroneous construction of the act. It requires, as one of the conditions of the grant of the power conferred, that an affidavit "to the effect that the persons, whose written assents are thereto attached and filed as aforesaid, comprise two-thirds of all the resident taxpayers of said town on its assessment-roll next previous thereto," should be filed with such assent; but it does not state or declare — certainly not in terms — that such affidavit shall be the evidence of the requisite assent, nor that it shall operate as a protection to the lender; nor is there anything in the act from which it can be fairly inferred that such was its object. The material and controlling requirement was the assent in fact of the taxpayers, expressed in writing, signed *Page 451 
by them. The ordinary proof, to establish that, was the evidence of a witness to the signature, or of some person acquainted with it and able to express a belief that it was genuine; but it was competent for the legislature to provide that an affidavit or any other proof should be sufficient. That has not been done in the case before us. It is important here to observe, that the affidavit necessary to be filed is required to be made by the supervisor or commissioners, or any two of them, charged with the duty of obtaining the requisite assents, while it is provided that such assent might be obtained by some one or more of them. It may be (and as it appears there were three several papers, purporting to be such assents, it probably was the fact) that the signatures, or most of them, were procured through the separate agency of those officers, but it is not reasonable to assume that all were so procured by the supervisor. The person who did act and perform the duty would be able to prove the actual subscription of the signature, and it is not at all probable that the others, or either of them, were sufficiently acquainted with the handwriting to prove its genuineness. It was, however, competent for all of them, after an examination of the proper assessment-roll, to swear that the persons, whose names purported to be subscribed to those assents, comprised two-thirds of all the resident taxpayers on it, and that, in my opinion, was all that was intended to be proved by that affidavit. This construction is reasonable and consistent with the general design and intention of the act. Such an affidavit would relate to a matter merely of computation, and when the verity of it was to be established by the oath of two individuals, reasonable proof, in that respect, was secured; but the fact of such assent was to be ascertained and proved like any other fact, of which the evidence was manifested in writing. The affidavit in question does not, in terms, state, and I do not think the statement therein made, "that the several persons whose written assents are hereto attached" can be construed to mean, that those persons subscribed such assents. It was sworn to by four different individuals, and it is not, in my opinion, to be credited that all *Page 452 
and each of them could swear to the genuineness of the signature; but on the contrary, the fair construction of their language is, that they only meant to say that those persons constituted two-thirds of the residents of their town who were taxed on the assessment-roll referred to. It may be added, that the ordinary proof of the execution of a written instrument, authorized to dispense with oral testimony, is the certificate of an officer appointed to take such proof, and there is nothing to warrant us in the conclusion that it was the intention of the legislature, after providing all the safeguards it has, against the creation of a debt, unless assented to by the town, that the mere filing of a paper, purporting to be evidence of the consent required by the law, without an affidavit, at least clearly showing that it was genuine and actually signed by the persons whose names appear as subscribers, should be sufficient proof to establish the important fact of such assent.
These views lead us to the conclusion that it was incumbent on the plaintiff to prove that the written assents given in evidence had actually been signed by the requisite number of taxpayers designated in the act, and that the omission to provide such proof is fatal to the recovery. In coming to this conclusion, I have not overlooked, nor failed to give full effect to, the decision of this Court in the case of The Bank of Rome v. TheVillage of Rome (19 N.Y., 20). The provision of the statute under which that case was decided, and which has already been referred to in considering the constitutional question above discussed, is materially different from the law under consideration. That act, after conferring the power on the village to subscribe for railroad stock and to issue bonds for the payment thereof, on obtaining an approval of the said act itself by two-thirds of the electors required by the eighth section above cited, which was to be ascertained at a special election to be held and conducted at the time and in the manner directed in the ninth section, provides in that and the tenth section, that the trustees of the village, after the canvass directed to be made at such election, "shall immediately thereafter return to the clerk of the board of trustees the *Page 453 
aggregate number of votes taken, designating how many were for and how many against taking railroad stock" (§ 9), and that "the president and trustees shall, within two days after the return of said trustees to the clerk, meet and proceed to canvass the votes thus certified and returned, and shall make out and file in the office of the clerk of Oneida county the certificate setting forth that this act is approved or not approved, as the case may be; and if it shall appear from such certificate that this act has been approved and the issue of stock authorized, the president and trustees of said village shall proceed to make subscription and to issue bonds as authorized by this act." (§ 10.) It will be seen from these provisions of that act above referred to, that the power to subscribe for the stock and issue the bonds, was to become operative and effectual on the approval of the act by the electors of the village; and that the certificate of such approval, duly filed in the office of the clerk of the county of Oneida, was declared to be evidence of that fact and fully authorized such subscription and the issue of bonds therefor. Those bonds were directed to be placed under the entire control and management of five individuals called "Commissioners of the Railroad Fund of Rome," who were vested with the power of "entire control and negotiation of said bonds" upon certain terms and restrictions; and it was conceded in that case that the bonds had been legally issued to such commissioners, and the question there discussed and decided arose upon their disposition thereof. The decision made therein therefore does not conflict with the views above expressed, but is entirely consistent therewith.
3d. As the requisite assent to borrow money and do the other acts authorized by the law in question may be shown on a new trial, it may be proper to consider and determine now, whether (conceding such assent to have been given) the power has in fact been executed so as to create a liability on the part of the defendant. The power conferred was limited to the performance of certain acts, and was to be executed by the supervisor and the assessors of the town. The object was to extend aid towards the construction of a railroad or railroads running *Page 454 
through the city of Auburn, connecting Lake Ontario with the Susquehanna and Cayuga Railroad or the New York and Erie Railroad. That aid was to be afforded by the payment to a railroad company organized for that purpose, of such a sum of money as those officers might deem necessary, not to exceed twenty-five thousand dollars to be borrowed on the faith and credit of the town, or raised by tax therein, at the election of the taxpayers, to be expressed in and by their written assent before-mentioned; and for the amount so paid an equivalent amount of stock was authorized to be subscribed and taken in the name of their town. If the money was borrowed, the supervisor and assessors were authorized "to execute therefor, under their official signatures, a bond or bonds," to be made payable with interest on such terms as might be agreed upon and expressed in the bonds. The money so borrowed was directed to be paid over to the president and directors of such railroad company as might be designated in that assent, to be expended by them in grading, constructing and maintaining such railroad or railroads. The bonds were authorized to be issued for money actually borrowed and for no other purpose or consideration, but they were in fact delivered to the railroad company for stock to an equal amount in value, with the object, as is evident from the agreement made at the time of such delivery, that they should be sold in the market for the purpose of raising money on them in that manner. This was not an execution of the power and authority granted, but an appropriation of them in a manner not contemplated by the legislature nor by the assent given.
It was evidently the intention of the act that money should be raised and paid over to aid in the construction of a railroad, and no color is given to the idea or the position that the credit merely of any town should be given, through and by which money might be raised. A town might be willing to incur a debt to a limited sum, with the knowledge that the whole amount for which it was incurred was actually to be appropriated to the construction of a railroad that might be deemed conducive to its interests, but would absolutely refuse to issue *Page 455 
their bonds, for the purpose of sale, from which much less than the amount for which they were given might be realized. If it had been intended to authorize bonds to be given for stock, there is no reason why that intention should not have been declared, as was done in the law in relation to the village of Rome above referred to. The statute, under any aspect of it, confers extraordinary powers, by which heavy burdens, for the term of twenty years, may be imposed on one-third of the taxable inhabitants against their will for an enterprise which they may deem injudicious and inexpedient; and indeed actually prejudicial to the welfare of their town. It therefore should receive such construction as its language and terms clearly call for; and the powers granted should not be extended by implication, or on the idea that the same end may be attained in a different manner. There is no ambiguity in the language of the act by which the power in question is granted, and it is unquestionable that the bonds issued were not given for money borrowed, the purpose for which, and for which only, they could be used. They were therefore clearly issued without authority and as the railroad company received them on a consideration not authorized, it was chargeable with a knowledge of their invalidity, and they never could have enforced them. The plaintiff stands in no different or better position. He purchased those on which this action is brought directly from the company, with full notice of the facts and circumstances under which they had been received. He is therefore not a bona fide holder of them, and the rights of the parties are to be determined in the same manner and on the same principles as if the company was seeking to collect them.
These considerations lead us to the conclusion that the defendants are not liable to the plaintiff on these bonds, and that the judgment of the court below is consequently erroneous and must be reversed and a new trial ordered. *Page 456