## SCIPIO *v.* WRIGHT.

1. An act authorizing a town to borrow money for aiding in the construction of a railroad provides that "all moneys borrowed under the authority of this act shall be paid over to the president and directors of such railroad company (now organized, or such company as may be organized, according to the provisions of the general railroad law, passed April 2, 1850) as may be expressed by the written assent of two-thirds of the resident tax-payers of said town, to be expended by such president and directors in grading, constructing, and maintaining a railroad or railroads passing through the city of Auburn, and connecting Lake Ontario with the Susquehanna and Cayuga or the New York and Erie Railroad." *Held,* that the tax-payers were not thereby required to "express" (that is, designate) the company by name; and that an assent authorizing the money to be paid "to the president and directors of a railroad company organized according to the requirements of the general railroad laws for the purpose of constructing a railroad connecting Lake Ontario with the Susquehanna and Cayuga Railroad and passing through the city of Auburn," was sufficient.

2. A prerequisite to the issue of bonds by town authorities, that the written assent of two-thirds of the resident persons taxed in said town, as appearing on the assessment-roll made next previous to the time such money may be borrowed, shall be obtained, verified, and filed in the clerk's office of the county, is intended as a protection against a town debt rather than against the form it might assume after it had been incurred, or when the security for it should be given. And where such prerequisite was coupled with authority to subscribe to the capital stock of a railroad company a sum equal to the amount of the bonds issued, — *Held,* that they are not invalid because not issued until after the date when the assessment-roll referred to was by law required to be completed, the assent having been filed, and the subscription for the stock of the company made, the bonds executed and some of them sold and the proceeds paid on account of the subscription before that date.

3. A statute of New York authorizing towns to subscribe to the capital stock of railroad companies and issue bonds for the purpose of borrowing money therefor, prescribed the manner in which the power conferred should be exercised. It appearing to be the settled construction given by the courts of that State to this statute, under which certain bonds now in suit were issued, and to other similar statutes, that they do not authorize an exchange of bonds for shares of stock, and that a purchaser, with notice that such a disposition of the bonds was made by the town officers, cannot recover in a suit brought upon them, this court follows this construction of the State statute.

ERROR to the Circuit Court of the United States for the Northern District of New York.

This was an action brought by William P. Wright against

the town of Scipio, on twenty-five instruments in writing, numbered from 1 to 25, both inclusive, all being alike, except as to their number, and also except that eight of them, being those numbered from 1 to 8, both inclusive, are payable to Slocum Howland or bearer. The others are payable to bearer, no payee being named therein. To all were annexed coupons for the sum of thirty-five dollars each, differing only as to the time when payable, there being one coupon for each instalment of semi-annual interest on each bond, the first being due July 1, 1858, and the last, Jan. 1, 1873. One of which instruments is in the words and figures following, viz. : —

"No. 2.]      State of New York, County of Cayuga.    [$1,000.

"Seven per cent loan, not exceeding $25,000.

"Be it known that the town of Scipio, in the county of Cayuga and State of New York, in pursuance of an act of the legislature of said State, entitled 'An Act to authorize any town in the county of Cayuga to borrow money for aiding in the construction of a railroad or railroads from Lake Ontario to the New York and Erie or Cayuga and Susquehanna Railroad,' passed April 16, 1852, and for the purpose of aiding the construction of the Lake Ontario, Auburn, and New York Railroad, owes and promises to pay to Slocum Howland or bearer one thousand dollars, with interest at the rate of seven per cent, payable semi-annually on the first days of January and July in each year, on surrender of the coupons hereto attached, at the Bank of the State of New York, in the city of New York, the principal to be reimbursable at the same place at the expiration of twenty years from the first day of January, 1853.

"In testimony whereof, the supervisor and commissioners of the town of Scipio have, pursuant to the provisions of the act aforesaid, and the written assent of two-thirds of the resident tax-payers of said town, obtained and filed in the office of the clerk of the county of Cayuga, hereunto subscribed their names this twentieth day of May, A.D. 1853.

"William Taber,
*"Supervisor.*
"Calvin Tracy,
"George Slocum,
*"Commissioners."*

One of the coupons next to said instrument No. 2 is in the words and figures following : —

"$35.]

"The town of Scipio, in the county of Cayuga, hereby acknowledges that there will be due the bearer thirty-five dollars, payable at the Bank of the State of New York, in the city of New York, on the first day of July, 1858, being interest due on that day on bond No. 2.

"William Tracy,
"*Supervisor.*
"Calvin Tracy,
"George Slocum,
"*Commissioners.*"

Wright recovered judgment, and the town removed the case here.

The remaining facts and the statutes bearing upon the case are stated in the opinion of the court.

*Mr. George F. Comstock* and *Mr. S. Edwin Day* for the plaintiff in error.

*Mr. David Wright, contra.*

Mr. Justice Strong delivered the opinion of the court.

At the trial of this case in the Circuit Court the extraordinary number of thirty-three exceptions were taken by the plaintiff in error, and signed by the judge. It does not, however, always happen that the merits of a case brought in error are to be measured by the number of exceptions taken in the inferior court, or by the number of errors assigned. In this case, the real questions — the only ones that need particular attention — are few.

The plaintiff below brought suit upon twenty-five bonds, or rather notes, each for the sum of $1,000, which, as he alleged, had been issued by the township in pursuance of and under authority of law. Of course, it was incumbent upon him to prove that the town was authorized to create the instruments, and to dispose of them in the manner in which disposition of them was made. The authority relied upon was an act of the legislature passed on the 16th of April, 1852, entitled "An

Act to authorize any town in the county of Cayuga to borrow money for aiding in the construction of a railroad or railroads from Lake Ontario to the New York and Erie, or Susquehanna and Cayuga Railroad." The first section enacted as follows : —

"It shall be lawful for the supervisor of any town in the county of Cayuga" (the town of Scipio being one), "and the assessors of such town, who are appointed by this act as commissioners to act in conjunction with the said supervisor in effecting and executing the purposes of this act, to borrow, on the faith and credit of said town, such a sum of money as they may deem necessary, not to exceed $25,000, for a term of time not to exceed twenty years, with such rate of interest as may be agreed upon, not exceeding seven per cent per annum, and to execute therefor, under their official signatures, a bond or bonds on which the interest shall be made payable annually or semi-annually during the term said money may be borrowed. . . . All moneys borrowed under the authority of this act shall be paid over to the president and directors of such railroad company (now organized, or such company as may be organized, according to the provisions of the general railroad law, passed April 2, 1850), as may be expressed by the written assent of two-thirds of the resident tax-payers of said town, to be expended by such president and directors in grading, constructing, and maintaining a railroad or railroads passing through the city of Auburn, and connecting Lake Ontario with the Susquehanna and Cayuga Railroad, or the New York and Erie Railroad: *Provided always*, that the said supervisor and commissioners shall have no power to do any of the acts authorized by this act, until a railroad company has been duly organized according to the requirements of the general railroad law for the purpose of constructing the aforesaid described railroad, and the written assent of two-thirds of the resident persons taxed in said town, as appearing on the assessment-roll of such town made next previous to the time such money may be borrowed, shall have been obtained by such supervisor and commissioners, or some one or more of them, and filed in the clerk's office of Cayuga County, together with the affidavit of such supervisor or commissioners, or any two of them, attached to such statement, to the effect that the persons whose written assents are thereto attached and filed as aforesaid comprise two-thirds of all the resident tax-payers of said town on its assessment-roll next previous thereto."

The second section we also quote, as follows, so far as is needful :—

" SECT. 2. It shall be lawful for the supervisor and commissioners of any town in said county, on obtaining and filing such assent, as provided in the first section, to subscribe for and take in the name of and for said town, such a number of shares of the capital stock of such company as shall or may be organized for the purpose of constructing the aforesaid described railroad or railroads, as will be equal to the amount of the bonds executed under the authority of this act."

The tenth section made it the duty of the electors of the town to elect at the next annual town meeting two commissioners to act in conjunction with the town supervisor in carrying into effect the provisions of the act.

At the time when this act was passed, so far as it appears, there was no organized company in existence with power to build such a railroad as the act described; but on the 23d of August next following, articles of association of such a company, organized under the general railroad laws of the State for the purpose of constructing a railroad from Lake Ontario to the Cayuga and Susquehanna Railroad, passing through Auburn and Scipio, were filed in the office of the Secretary of State. Subsequently to the formation of this company, the supervisors and assessors of the town obtained a written assent of three hundred and one residents and taxables of the town, appearing on the assessment-roll for the year 1852, and on the 8th of December, 1852, two of the assessors made oath that the persons whose written assents were attached thereto comprised two-thirds of all resident tax-payers of the town of Scipio, on the assessment-roll thereof for the year 1852. These assents and the affidavit indorsed thereon were filed in the clerk's office of Cayuga County on Jan. 11, 1853. On the 1st of March, 1853, two railroad commissioners were duly elected for the town, and on the 16th of May next following, they, together with the supervisor, in the name and for the town, subscribed upon the books of the said railroad company for five hundred shares of fifty dollars each of its capital stock. On the 20th of the same month they executed by their official signatures the twenty-five notes in suit, payable to

bearer. Eight of them were sold by the commissioners to Slocum Howland at par; and the proceeds of the sale were paid to the railroad company on account of the stock subscription, the commissioners taking from the company for the town a certificate for the five hundred shares of stocks, which, so far as it appears, the town now holds. To this extent money was borrowed upon the bonds, and paid over in accordance with the statute. Howland also bought the remaining seventeen bonds from the railroad company, to which they had been delivered by the railroad commissioners under an arrangement we shall notice hereafter, and the company indorsed the certificate of stock as full paid. It is out of these facts that the principal questions involved in the case arise.

It is contended by the plaintiff in error that the bonds were unauthorized; because, as it is alleged, the written assent of the tax-payers did not conform in substance or meaning to the requirement of the statute, in that it did not " express the railroad corporation to which the moneys to be borrowed by the town should be paid." We think this position is quite untenable. The identification of the company in the written assent is as perfect as it would have been had it been described by its corporate name. The statute did not require that the taxpayers should " express " (that is, designate) the company by its name. Any mode of description that designated it was sufficient. The assent authorized the commissioners to pay the money borrowed, for which the bonds were to be given, " to the president and directors of a railroad company organized according to the requirements of the general railroad laws for the purpose of constructing a railroad connecting Lake Ontario with the Susquehanna and Cayuga Railroad, and passing through the city of Auburn." This was in strict conformity with the description given in the statute. It fitted exactly the company organized in August, 1852, and there cannot be a doubt that the assent was intended to designate that company. There was no other company in existence to which the description could apply. Unless, therefore, the word " express," as used in the statute, was intended to convey some other meaning than " *described* " or " *designated* " (which can be maintained

with no show of reason), the assent in form was all that was required for authority to issue the bonds.

A second position taken by the plaintiff in error is that all the bonds except three are void, because they were issued after the assents of the tax-payers as appearing on the assessment-roll of the town for the year 1852 had spent their force and ceased to be authority. This is founded upon the phraseology of the statute, which requires as a prerequisite to any action by the commissioners that the written assent of two-thirds of the resident persons taxed in said town, as appearing on the assessment-roll made next previous to the time such money may be borrowed, shall be obtained, verified, and filed in the clerk's office. Recalling the facts, heretofore stated, the written assent of the required number of tax-payers on the assessment-roll of 1852 was obtained and verified, and it was filed on the 11th of January, 1853. Then the authority to issue the bonds, borrow the money, subscribe for the stock, and elect railroad commissioners became perfect. The town did elect railroad commissioners on the 1st of March, 1853, the subscription for the stock of the company was made, a debt of $25,000 therefor was incurred, and the bonds or notes for an equal amount were executed, and at least some of them were sold at par and the proceeds of the sale were paid on account of the subscription, all before any new assessment-roll could be completed and before the law required any to be made. For all this there was complete authority. Every thing had been done which was required to authorize the creation of the indebtedness to the railroad company. Did the legislature intend that after the town had lawfully created a debt and lawfully executed bonds with which to borrow the money necessary to pay it (bonds confessedly authorized at the time when they were made), the bonds should become void if the money could not be borrowed within two months and a half, or between May 20 and Aug. 1, 1853? Did it intend thus to leave the debt in existence, and at the same time to take away the power to provide means for its payment? Such a construction of the act would be most unreasonable. It would be standing upon the letter and ignoring the spirit of the statute. It would be closing our eyes to the only substan-

tial reason for requiring the assent of two-thirds of the resident tax-payers before the commissioners could exert the power given to them by the legislature. That was to ascertain whether the tax-payers would consent to the creation of a town liability, not to ascertain how or when the debt, when incurred, should be evidenced. The substance of the power was the creation of a town-debt. All the rest was formal. The legislature, it may be admitted, did not intend that the power conferred upon the railroad commissioners should continue indefinitely. Hence the assent of two-thirds of the taxable residents as appearing on the assessment-roll made next previous to the borrowing of the money was required. But evidently by this was meant that the assent should be given by the tax-payers appearing on the roll made next before any debt of the township should be incurred. It was protection against a town debt that was intended, rather than protection against the form of the debt or the shape it might assume after it had been incurred or when the security for it should be given. Two distinct powers were given by the statute, each dependent for its exercise, though not for its creation, upon the prior consent of the taxables. The one was described by the first section. It was to borrow money and execute bonds therefor, paying over the money borrowed to a railroad company to be expended in grading, constructing, and maintaining its road. This section made no reference to a subscription for the stock or to a debt directly to the railroad company.

But the second section authorized a subscription to the capital stock and the consequent assumption of a legal liability to the company, equal to the amount of the bonds issued, which might be discharged afterwards by levying a tax, or by borrowing money, giving bonds therefor, and paying it over. Nothing in the act postponed a subscription for stock until the money to pay for it could be borrowed. This debt was incurred before the assessment-roll of 1853 had any existence. The right to incur it when it was incurred was, therefore, complete. The exercise of the power was warranted by the written assent filed. For these reasons we think the instruments sued upon are not invalid, because they were not issued until after Aug. 1, 1853, when the assessment-roll for that year was by law required to be completed.

The only other question raised by the assignments of error, and by the numerous exceptions, is, whether the circuit erred in refusing to rule, as requested by the defendant, that the plaintiff could not recover for the last seventeen bonds, because, instead of having been issued for money borrowed, they were issued directly to the railroad company in exchange for its stock.

This objection has no application to the first eight bonds, numbered from 1 to 8 inclusive. They were sold at par, and the proceeds were paid over to the company. This was, as we have said, a substantial borrowing. The facts respecting the remaining seventeen, as they appear in the record, may be thus summarized: —

On the 7th of January, 1854, the railroad company received from the "railroad commissioners" of the town the seventeen bonds, nominally at par, and indorsed "full paid" on the certificate of stock, which the town had previously taken, and upon which $8,000, the proceeds of the first eight bonds, had been paid. This arrangement was accompanied by a written understanding that the company might at any time within eight months from Oct. 11, 1853, redeliver the bonds, or any part of them, to the town, and reduce the amount of credit on the certificate accordingly; and that if the company should sell the bonds for more than par, it should account to the town for the excess, but that the town might at any time within the said eight months, and prior to the sale of the bonds by the company, have the right to demand the redelivery thereof on payment to the company of the par value. The bonds were never redelivered, nor were they demanded. Some time after Jan. 7, 1854 (when does not exactly appear), Slocum Howland bought the seventeen bonds from the railroad company, with notice that money had not been borrowed upon them, but that they had been transferred by the town supervisor and railroad commissioners, or one or more of them, in the first instance to the company in exchange for its stock. What Howland paid for them, whether the company obtained their full par value, is not proved.

Howland held the bonds until 1874, after they became due, when he sold them to the plaintiff, taking his note for the whole

price, and that note remains unpaid. Neither Howland, therefore, nor Wright, the purchaser from him, stands in the position of a *bona fide* purchaser without notice of the exchange of the bonds for stock. Had either of them been such a purchaser, the plaintiff's right to recover could not be gainsaid. But the question now is, whether the fact that the bonds were not issued for borrowed money, but were exchanged for stock of the railroad company, is a defence for the town against a holder who, when he purchased, had notice of the manner of their issue. Were the question an open one, it would seem that it ought not to be a defence. It might be regarded as a fair presumption that the bonds were sold to Howland for not less than their par value, and that the company received their full amount in money; or the transaction might be regarded as practically a borrowing of the money by the town through the agency of the railroad company. So far as discharging the debt of the town for its stock subscription is concerned, and so far as relates to obtaining a full-paid certificate, the transaction is, in legal effect, the same as if the money had been borrowed by the town directly and paid over to the company. And, if it had appeared affirmatively that Howland had paid the full face of the bonds and interest, without any discount, when he bought, every object which the statute could have had in view in enacting that it should be lawful for the town officers to borrow on the credit of the town a limited amount of money and pay it over to the railroad company, executing town bonds therefor, would have been accomplished. In *Gould* v. *The Town of Sterling* (23 N. Y. 456), it was said by Selden, J., when speaking of a transaction like that we have now under consideration, where there had been an exchange of town bonds for railroad stock: "If what was done was the same in effect as if the money had been borrowed and paid over to the railroad company, the difference in form would not be material." Such a case, however, is not presented by this record.

The statute prescribed the manner in which the power it conferred should be exercised. The town was at liberty to subscribe for stock, but if bonds were used to pay for it the mode of use was directed to be borrowing money with them and paying the money to the railroad company. . It is quite

conceivable that the purpose of such a direction, instead of allowing an exchange of the bonds for the stock taken, was that the railroad company might obtain an amount of money equal to the amount of the bonds. This was important to the company, to the town as a stockholder, and to the public as interested in the projected railway. If the bonds might be delivered directly to the company in payment of the stock, it might sell them at a discount. Thus it would fail to obtain the assistance in building its road which the legislature contemplated it should have. Its stock would be practically sold for less than par, and it would not be worth as much to the town as it would be had all the money for which the bonds were given come into the company's treasury. Whether such were the motives that induced the peculiar phraseology of the statute or not, the highest court of New York has repeatedly construed it as prescribing the manner in which the bonds might be used or issued, and as denying the power to exchange them directly with the railroad company for the stock taken by the town. These decisions have been constructions of the identical statute we have now under consideration, and by which the bonds now in suit are alleged to have been issued. The construction given by the State court must, therefore, be our guide. *Starin* v. *The Town of Genoa* (23 N. Y. 439) was a suit for interest upon town bonds made under the act. They had been exchanged with a railroad company for capital stock taken for the town, and the exchange was accompanied by the same agreement as that made between the town and company in the present case. The plaintiff was a purchaser from the railroad company, with knowledge that it had received the bonds in payment of stock. In these respects the case was exactly like the present. The Court of Appeals ruled that issuing the bonds by exchanging them for the company's stock was not an execution of the power and authority granted by the statute, but an appropriation of them in a manner not contemplated by the legislature, or by the taxpayers' assent. The court said, " It was evidently the intention of the act that money should be raised and paid over to aid in the construction of a railroad, and no color is given to the idea or position that the credit merely of any town should be given, through and by which money might be raised." They, there-

fore, held that the bonds were issued without authority, and as the railroad company received them on a consideration not authorized, it was chargeable with a knowledge of their invalidity, and it never could have enforced them. It was further ruled that the plaintiff stood in no better position, that having purchased with notice of the manner in which they had been issued, he was not a *bona fide* holder. *Gould* v. *The Town of Sterling* (23 N. Y. 456) is a similar case, and the ruling of the court was the same. In *The People* v. *Mead* (24 id. 114) we find a reassertion of the invalidity of bonds first negotiated by exchanging them for stock of the railroad company. The opinion was delivered by Denio, J. It was, however, said that a *bona fide* holder, who had no knowledge that the railroad company had received the bonds in payment for the stock taken for the town, would not be liable to the defence which existed against the railroad company. *Horton* v. *The Town of Thompson* (71 id. 513) is another case in which the Court of Appeals gave the same construction to another similar statute, holding that bonds exchanged for stock were unlawfully issued, and that a purchaser, with knowledge that they had been thus issued, could not enforce them.

It thus appears to be the settled construction given by the courts of New York to the act under which the bonds now in suit were issued, and to other similar acts, that they do not authorize an exchange of bonds for shares of the capital stock of railroad companies, and that a purchaser who had notice at the time of his purchase that such a disposition of the bonds was made by the town officers or railroad commissioners, cannot recover in a suit brought upon them.

We find no decision of the Court of Appeals that is in conflict with what was ruled in the cases we have cited, or which weakens their authority, and as they are constructions of a State statute, we are constrained to follow them. *Gould* v. *The Town of Oneonta* (71 N. Y. 298), to which we have been referred, presented an entirely different question. A statute enacted in 1859 had authorized the transfer of the bonds directly to the railroad company in payment of the stock.

Our conclusion, then, is that the Circuit Court erred in declining to instruct the jury, as requested, substantially, that upon

the facts proven in the case (and not contradicted), the plaintiff was not entitled to recover upon any of the seventeen bonds, because the supervisor and commissioners did not issue them for borrowed money, but transferred them to the railroad company in payment of the stock subscription.

We find no other error in the record.

The judgment will be reversed and the cause remanded for a new trial; and it is

*So ordered.*

MR. JUSTICE CLIFFORD and MR. JUSTICE SWAYNE dissented.