## LEWIS *v.* BOARD OF COUNTY COM'RS OF SHERMAN CO.

### *(Circuit Court, D. Nebraska. January 3, 1881.)*

1. **COUNTY COURT-HOUSE BONDS—WHEN INVALID—NEBRASKA.**—Certain county court-house bonds, issued by a county in the state of Nebraska, *held invalid:* (1) because there was no statutory authority to vote for such bonds; (2) because no bonds had ever been voted by the county for any such purpose; (3) because none of such bonds, or the proceeds thereof, were ever used to build a court-house, or were ever used for any other purpose by the county; (4) and because such bonds contained no recitals showing that the same had been issued conformably to law.

2. **STATUTE—POWER TO "BORROW MONEY"—POWER TO ISSUE BONDS.**—A law authorizing the electors of a county to empower the commissioners of a county to *"borrow money"* for the erection of a court-house, does not authorize them to empower such commissioners to *issue bonds* for that purpose.

3. **SAME—SAME—SAME.**—The authority to issue bonds as an evidence of indebtedness might perhaps follow as an incident of the right to borrow money, but, in that case, the amount of money borrowed should equal the amount for which the bonds call.

4. **COUNTY BRIDGE BONDS—WHEN VALID—NEBRASKA.**—Certain county bridge bonds, issued by a county in the state of Nebraska, reciting that they were issued conformably to law, *held valid* in the hands of an innocent purchaser for value, in open market, when the bridges were built in the county, by direction of the county, for the county, and were paid for by such bonds, or their proceeds, although such bonds were not in fact authorized by a vote of the people, as the law required.—[ED.

Findings of the court, jury trial having been waived in writing.

It is found from the pleadings and the testimony produced in support thereof: That the bonds described in the plaintiff's petition as court-house bonds, from which a part of the coupons in suit were detached, are invalid, for the reason that no vote of the people ever authorized their issue, and for the further reason that the county never realized anything thereon, and no part of any proceeds of the same was ever used for or applied to the erection of a court-house, and that there is no recital in the bond, so called, showing that the bonds were properly issued, so as to estop the defendant from insisting on their invalidity. *Second.* That the bonds described in plaintiff's petition as bridge bonds, from which the other coupons in suit were detached, were issued without having been authorized by a vote of the people. But the bridges were built in the county, by direction of the county, for the county, and were paid for by the bonds, or from proceeds thereof, and the recitals in the bonds, showing that they were issued conformably to law, estops the defendant from setting up the defence relied on, as the plaintiff was an innocent purchaser for value, etc.; that the bridge bonds were issued and put in circulation, and were found for sale in open market by the plaintiff.

*Alfred Ennis*, for plaintiff.

*T. M. Marquett*, for defendant.

DUNDY, D. J.   This suit is based on a large number of coupons, long overdue, detached from two series of bonds issued by Sherman county, or, at least, by officers representing the county, one of which series of bonds was issued for the purpose of building a court-house, and the other series for the purpose of building bridges, in the county. The defence to the bonds is that they were never voted for by the people of the county; that they were never issued by the county; and that neither the court-house bonds, nor the proceeds thereof, were ever applied in any manner to the erection of a court-house.

It is made to appear from the minutes of the county commissioners that the court-house bonds were issued and placed in the hands of a banker at Kearney, probably for the pur-

pose of being negotiated. But, sometime thereafter, the bonds were recalled by the county board, for what particular purpose does not appear. At what time or in what manner or for what particular purpose these bonds were afterwards turned loose on the market, is not shown; nor does it make any particular difference in that regard.

It may be conceded, as a general proposition, that a "court-house" is a work of internal improvement; but it may very well be questioned whether our internal-improvement law of the fifteenth of February, 1869, has any application to such a work of internal improvement. As early as the year 1856, the territorial legislature provided for the building of court-houses and jails, and made ample provision therefor. The same law has been in force almost ever since, and, with few slight changes, is the law to-day. When the internal-improvement law of 1869 was passed, it was well enough understood that it was passed for the express purpose of enabling counties, cities, and towns to vote aid to railroads and bridges, and works of a kindred character. No one supposed it to be necessary to pass such a law to enable a county to build a court-house. Ample provision had already been made by law therefor. On the twenty-seventh of February, 1873, before these bonds were issued, the legislature re-enacted the old law, with slight changes, which authorized the building of court-houses, and it is believed to be the only general law which authorizes the expenditures of money for any such purpose. This law indicates pretty clearly the mode of proceeding when it is necessary or desirable to build a court-house.

Section 14, p. 234, Gen. St. of Nebraska, has this provision: "The board of county commissioners, at any meeting, shall have power * * * (3) to purchase sites for and to build and keep in repair county buildings; * * * (4) apportion and order the levying of taxes as provided by law, and to borrow upon the credit of the county a sum sufficient for the erection of county buildings. * * *" "Section 15. The board of county commissioners shall not * * * borrow money for the purpose specified in the fourth sub-

division of the preceding section without first having submitted the question * * * of borrowing money as aforesaid to a vote of the electors of the county." Other provisions of the law perfect the details of the business to be transacted by the commissioners in connection with the voting and borrowing money.

It will be seen, from the foregoing, that before the commissioners can lawfully borrow money for the purpose of building a court-house the right and authority to do so must be conferred by a vote of the electors of the county. This is indispensable, as no right for such purpose exists without it. It must be observed that the authority *here* conferred on the county commissioners is to *borrow money* to build a court-house. The law does not authorize the people to vote *bonds* to erect the building. They may, by their votes, lawfully empower the commissioners to *borrow money* for the purpose in question, but they cannot authorize the commissioners to issue bonds for such a purpose, and have them hawked around the county and sold to A., B., and C. to raise money at a ruinous discount for any such a purpose.

It is *one* thing to authorize the borrowing of money to build a court-house when needed, but it is *another* and very *different* thing to vote for the issuing of bonds therefor, when the law does not authorize it. It is true, if the people, by a proper vote, should authorize the commissioners to borrow money, that, on receiving the money, a bond or other evidence of indebtedness might be given for the payment of the money when due under the terms of the loan. This would, perhaps, follow as an incident to the right to borrow. But, even then, the amount of money so borrowed should equal the amount for which the bond was given, otherwise there would be no end to the fraudulent practices of both officers and purchasers of bonds. Such a practice cannot be encouraged, and it is the duty of courts to close the doors against it. If, then, the law does not authorize the voting of bonds for any such a purpose as building a court-house, then the authority to borrow money cannot be enlarged by the commissioners or the people so as to include the right to

issue bonds and sell them at such price as can be procured therefor, when such authority has been withheld by the law-making power. This view is fully supported by a case recently decided by the supreme court, (*Scipio* v. *Wright*, 101 U. S. 665.)

So far as the court-house bonds are concerned, then, they must be held invalid, for the reasons: *First*, want of authority for voting bonds for the purpose of building a court-house; *second*, because no bonds were ever voted by Sherman county for any such purpose; *third*, because none of the bonds or the proceeds thereof were ever used to build a court-house, or were ever used for any other purpose by the county; and, *fourth*, because the bond contains no recitals showing that the same had been issued conformably to law, so as to cut off the defences relied on.

But with reference to the coupons taken from the bridge bonds it is different. There is full authority of law for the people of a county to vote for the issuing of bonds to aid in building bridges. The bridge bonds recite on their face that their issue was duly authorized by a vote of the people of the county, and that the result of such election was entered upon the commissioners' records, as provided by law. This recital is perhaps untrue, as the commissioners' proceedings show no such thing. But, as stated, the law authorizes the voting of bonds for such a purpose, and the bond recites the fact that they were properly voted for and authorized by a vote of the people of the county on the eleventh day of August, 1873, and that the result of the vote was spread upon the commissioners' journal of proceedings. The purchaser of the bonds, without notice of infirmity, was not in a position to know or believe that the bonds recited a falsehood on their face, and he was not, under the circumstances, bound to look beyond the bond itself. He might well believe what he saw stated in the bond. Fair dealing will not permit the defendant to gainsay what it has, through its proper officers, thus solemnly asserted. But this is not all. The law not only authorizes the issuing of bonds for such purposes, but they were so issued, and used direct in payment for building sev-

v.5,no.3—18

eral bridges in the county, the principal one being across the Loup river. The county has had the full benefit of the bridge bonds. They were turned over directly to the parties who built the bridges, and were by them put on the market and into circulation, with the statement on their face that they had been properly voted for and issued. Good faith and common honesty require their payment when found in the hands of innocent *bona fide* purchasers. The plaintiff must, therefore, have judgment on the coupons detached from the bridge bonds, with lawful interest thereon from the time the same became due and payable.