## LEWIS *v.* COMANCHE COUNTY.

*(Circuit Court, D. Kansas. May 31, 1888.)*

1. COUNTIES—LIABILITIES AND INDEBTEDNESS—ORGANIZATION—ABANDONMENT.

   A county was organized under act Kan. 1872, providing for the presentment of a memorial to the governor, signed by householders of the county, and authorizing him to have a census taken, and if there were 600 inhabitants, to appoint certain officers and name a temporary county-seat. The memorial was not signed by householders of the county, and the census and affidavits in regard to the number of inhabitants were false, the whole proceeding being in furtherance of a conspiracy to issue bonds of the county. After the bonds were issued, the officers and signers of the memorial decamped, and the county government was abandoned, but previously to the issue of the bonds the legislature had attached the county to another for judicial purposes. *Held*, that, although the organization was fraudulent and void, it was made a *de facto* organization by legislative recognition, and such organization was thereafter valid.

2. SAME—POWERS OF COMMISSIONERS TO ISSUE BONDS—RECITALS.

   The Kan. St. 1868. p. 256, § 16, subd. 4, giving county commissioners power to borrow money on the credit of the county, for the purpose of meeting current expenses, when a deficit exists in the county revenue, only authorizes the commissioners to borrow money when the deficit has actually occurred, and not in anticipation of such event; and a recital on the bond that "this bond is executed and issued to meet current expenses of the county in case of a deficit in the county revenue" does not bring it within the intent and meaning of said act, and the county is not estopped to show that there was no deficiency in the revenue, or that there were no current expenses to meet, although the bond had passed into the hands of an innocent purchaser without other notice than the recital on the bond.

3. SAME—ELECTION TO VOTE ON BONDS—RECITALS.

   Where a statute of Kansas required a petition of one-fifth of the voters of a county asking for an election to vote bonds, the required number of petitioners to be estimated by reference to the poll-books of the last general election, a holder of bonds issued by a county is not affected with notice that there had been no general election in the county, at the time of the issue, since its organization, and that the required reference could not have been made; but the recital of the commissioners that the bonds were issued in compliance with the statute is conclusive upon the county.

Action by Charles E. Lewis against the commissioners of the county of Comanche upon coupons of bonds issued by the county.

*Williams & Dillon* and *Rossington & Smith*, for plaintiff.

*G. C. Clemens* and *H. A. Smith*, for defendant.

FOSTER, J. The plaintiff alleges in his petition that the defendant is a corporation duly organized under the laws of the state of Kansas, and on or about March 10, 1874, made and issued its certain bonds, payable 10 years after date, with 10 per cent. interest, copies of which are attached; that said bonds had certain coupons attached for the interest to become due thereon, etc.; that the plaintiff is the holder and owner of the coupons sued upon, and praying judgment for something over $30,-000 and interest. The defendant denies, generally, the allegations of the petition, and specially denies that Comanche county was duly organized at the time said bonds were issued; that, on the contrary, it was not organized until February, 1885, and denies that it ever authorized

the making, issuing, or delivering of said bonds, etc. The agreed facts as to its organization are, briefly, as follows; Prior to September 8, 1873, Comanche county was an unorganized county of this state. On September 8, 1873, a petition was presented to the governor, purporting to be signed by over 40 inhabitants and electors of said county, stating that there were 600 inhabitants in said county, and asking that said county be organized, and that A. Updegraff be appointed census taker, and G. Brazell, R. Updegraff, and David Connell be appointee temporary county commissioners, and J. N. Lane temporary county clerk, and that the temporary county-seat be located on section 33, township 32 S., range 18 W., which petition was verified by three persons, whose residence is not stated. On September 23d a petition was presented to the governor, purporting to be signed by over 60 citizens of said county, asking to have Smallwood made the temporary county-seat. On October 15th Governor Osborn appointed A. Updegraff census taker of said county, who filed his oath of office, and thereafter proceeded to take, or pretended to take, a census of said county, and returned a list of 600 inhabitants, certified as correct, etc. On October 28th the governor issued his proclamation, which is as follows:

"PROCLAMATION.

"Whereas, a memorial signed by forty householders, residents of Comanche county, Kan., and legal electors of the state, whose signatures have been duly attested by the affidavit of three householders thereof, showing that said county has six hundred inhabitants, and praying for the organization of the same, said affiants setting forth that they have reason to believe, and do believe, said memorial; and whereas, it appears from actual enumeration by the census returns, duly made and certified according to law by an officer regularly commissioned and qualified, that there are six hundred *bona fide* inhabitants of said county of Comanche; Now, therefore, know ye, that I, Thomas A. Osborn, governor of the state of Kansas, by authority vested in me, have appointed and commissioned G. Brazell, A. J. Mowry, and David Connell special county commissioners, and H. H. Moss special county clerk of Comanche county, Kan., who were the persons recommended for said offices in said memorial, and do hereby declare Smallwood the temporary county-seat of said county.

"In testimony whereof I have hereunto set my hand, and caused to be affixed the great seal of the state.

"Done at Topeka, this 28th day of October, 1873.
[Seal.]                                          "THOMAS A. OSBORN.
"By the Governor.    W. H. SMALLWOOD, Secretary of State."

It will be observed that the governor does not declare the county organized, but appoints special county commissioners and a special county clerk, and declares Smallwood the temporary county-seat. This was all he was authorized to do under the law. The legislature has absolute power over the organization of new counties. It may designate just what proceedings are necessary to such organization. These proceedings may involve the exercise of ministerial and judicial powers, or it may be done by the direct act of the legislature itself. The governor's duties in this case are ministerial, and must be in substantial conformity to law. No proclamation of the governor declaring the county organized is re-

quired. Act March 1, 1872, p. 243; *State* **v.** *Commissioners*, 12 Kan. 445. The legislature, by the act of 1872, expressly points out the manner of the organization of new counties. After providing for the presentation of the memorial of 40 householders, duly verified, the governor appoints a census taker, who shall take the census, and make his return, and if it appears by such return that there are 600 *bona fide* inhabitants of said county, the governor shall appoint and commission three persons, who shall be recommended in the memorial, to act as county commissioners, and a proper person to act as county clerk, recommended in like manner, and shall designate the temporary county-seat; and from and after the qualification of the officers so appointed said county shall be deemed duly organized. There is no evidence in this case as to the officers having qualified, but inasmuch as they entered upon the discharge of their respective duties, and as it appears from the evidence they did perform some official acts, it may be presumed that they qualified as required by law. From the agreed facts and the evidence produced it appears, satisfactorily to my mind, that the names in the memorial to the governor for the organization of the county were not of householders of Comanche county, with possibly three or four exceptions. Nor were the persons who made affidavit thereto householders of said county, and said affidavit was false in fact; nor were there 600 inhabitants, nor a twentieth part of that number, in said county at the time the pretended census was taken; nor was there any taxable property, real or personal, in said county. The whole proceeding to organize said county was a conspiracy, a sham, and a pretense, supported by fraud and perjury, and accomplished for the purpose of making a *de facto* organization for the purpose of issuing bonds to enrich the conspirators, and to get money from innocent parties, and saddle a debt upon the future inhabitants of the county. When this had been accomplished, the conspirators decamped from the county. So far as the records are concerned, the organization appears to be (with some exceptions, such as the governor not appointing for clerk, and for one commissioner, the persons named in the memorial) substantially in compliance with the statute. From these facts there can be no doubt but that the pretended organization was illegal, fraudulent, and void. *State* v. *Commissioners, supra; State* v. *Sillon*, 21 Kan. 207.

A more difficult question, and one of much importance, remains to be determined. Was there such a *de facto* organization of the county as would impose upon it a legal liability to parties purchasing its bonds before due, and without notice of fraud? The plaintiff in this case is such a holder of these bonds. In this case there was legislative recognition of the organization of the county, by attaching it to another county for judicial purposes. If there was a *de facto* organization, then, under the decisions of the supreme court of Kansas, legislative recognition of the organization, as before stated, would validate and make legal the organization. *Harper Co. Case*, Id. 210; *Pawnee Co. Case*, 12 Kan. 426. And where the organization has been validated by legislative recognition, the removal of the officers from the county, or the failure to elect officers thereafter, would not blot out or destroy the organization thus given life

and validity. *Harper Co. Case, supra;* 1 Dill. Mun. Corp. § 110. Had this organization been followed up and accepted by the inhabitants of the county thereafter, and the machinery of the government kept in operation, this case would be quite similar to the *Harper* and *Pawnee Cases,* above quoted. But here there were no inhabitants; and the conspirators and officers, so called, all left for parts unknown soon after the bonds were issued; and for 11 years thereafter Comanche county, whether organized or unorganized, was unvexed by civil government. It had no officers, and no power to elect any, and there appeared no way to ever start the wheels of government but by a general or a special law for that purpose. So, in the year 1885, the territory of Comanche county was organized, in compliance with the law for the organization of unorganized counties. The *Harper* and *Pawnee Cases,* before cited, clearly hold such an organization as Comanche county had when the bonds were issued a *de facto* organization, and that legislative recognition, such as was had in this case, makes a valid organization. The construction and effect of such legislation, as well as of the statutes for the organization of new counties by the supreme court of this state, I apprehend will be accepted by the federal courts; and I cannot see that a subsequent abandonment of the county government could disorganize the county, and much less affect rights which had become vested before such abandonment. It therefore results, as a conclusion of law, that at the time these bonds were issued, the defendant county had a *de facto* organization, which had been made valid by legislative recognition; and it must be held in this case that such organization was thereafter valid and legal.

Passing now to the bonds in controversy, it appears that there were three classes of these bonds issued in Comanche county, as follows: $29,-000 court house, $23,000 bridge bonds, and $20,000 general expense bonds. The bonds issued for current expenses, under the act of 1868, contain a peculiar and somewhat ambiguous recital, which is as follows: "This bond is executed and issued to meet current expenses of the county in case of a deficit in the county revenue." The law evidently gave county commissioners the power to borrow money on the credit of the county for the purpose of meeting current expenses when a deficit actually existed; not to borrow money to meet a deficit in case such a contingency should happen in the future. St. 1868, p. 256, § 16, subd. 4. If this recital means what the words seem to imply, as it makes the purpose specific for which the bonds were issued, it would hardly do to say that the further recital, "that it is in pursuance of the act of February 29, 1868," would indicate a lawful purpose, but would rather indicate a misconstruction of the act by the commissioners issuing the bonds, and a belief on their part that they had a right to borrow money under said act to have on hand in case a deficit should occur. Again, this recital indicates an unlawful purpose in this: the act of 1868 did not give the commissioners authority to issue bonds to meet current expenses of the county in any case. They are given authority to borrow money on the credit of the county; a sum sufficient, etc. Assuming that the words "upon the credit of the county" gave them authority to issue obligations

of the county, (*Doty* v. *Ellsbree*, 11 Kan. 213,) then these bonds would be for borrowed money, and the vote of the people should have been taken upon the question of borrowing money. St. 1868, p. 257, § 17. So, where a municipality was authorized to issue bonds for borrowed money with which to pay for stock in a railroad company, it was held there was no authority for issuing the bonds direct to the railroad company for its stock. *Scipio* v. *Wright*, 101 U. S. 665. Also where the law authorized bonds to be issued for money borrowed for the purpose of building a court-house, it was held that the bonds could not be issued, and sold in open market. *Lewis* v. *Commissioners*, 1 McCrary, 377. Where the recitals on the bond show that there was not due authority for its issue, there can be no recovery *McClure* v. *Township of Oxford*, 94 U. S. 429; *Bates* v. *Winters*, 97 U. S. 83. Where the recitals are relied upon, they must be clear and unambiguous, in order to estop the corporation. *School-Dist.* v. *Stone*, 106 U. S. 183, 1 Sup. Ct. Rep. 84. It seems there was no law authorizing the registration of these general expense bonds, (St. 1872, p. 116, § 15,) and therefore the registration cuts no figure in the case. As the purchaser must take notice of the recitals on the bonds, it seems to me that the plaintiff is bound either by the recitals, or at least that there is no estoppel on the defendant to show that there was no deficit in the revenue, and that the bonds were illegally issued. To say that there were any current expenses for this county to meet, or that there was any revenue of said county, under the agreed facts and evidence in this case, seems a mockery of the terms of the statute. The only possible county expense that can be imagined these conspirators incurred was the expense of printing these bonds, and procuring a seal to stamp them with. It therefore follows that these current expense bonds are invalid and illegal in whosever hands they may have come.

Another objection made to the whole of these bonds by the defendant is this: That inasmuch as it required a petition of one-fifth of the voters of the county asking for an election to vote the bonds, to be determined by the poll-books of the last general election, the holder of these bonds must necessarily take notice of the date of the organization of the county, and that there could have been no general election or poll-books from which to determine this question. It does not impress me that this objection is well taken. The object of the statute was to require a certain proportion of the voters to sign the petition, and if, as a matter of fact, one-fifth did sign the petition, the purpose of the law had been accomplished, and in order to fix an undisputed guide for the commissioners to determine that question, the poll-books of the last general election are made the test. But it seems to me that this is a question to be determined by the commissioners; and if it be true that the poll-books referred to are those of the general November election only, yet, so far as a *bona fide* holder is concerned, the decision of the commissioners on that point must be conclusive, and the county is estopped by the recitations on the bonds that they are issued in compliance with the statute. *Knox Co.* v. *Aspinwall*, 21 How. 539; *Roberts* v. *Bolles*, 101 U. S. 119; *Rock Creek Township* v. *Strong*, 96 U. S. 271; *Clay Co.* v. *Society*, 104 U. S. 579; *Lincoln* v. *Iron Co.*, 103

U. S. 412; *Block* v. *Commissioners*, 99 U. S. 686; *Anthony* v. *Jasper Co.*, 101 U. S. 693; *Town of Coloma* v. *Eaves*, 92 U. S. 484; *Douglas Co.* v. *Bolles*, 94 U. S. 104; *County of Warren* v. *Marcy*, 97 U. S. 96.

The defendant makes several objections to the court-house bonds. These bonds recite both the acts of 1868 and 1872. There is some authority for holding that county buildings are included in "works of internal improvement" under the latter act. *Township of Burlington* v. *Beasley*, 94 U. S. 310. This question was rather incidentally referred to in said case, and also in the case of *Leavenworth Co.* v. *Miller*, 7 Kan. 479, but the question was not really before the court in either case, and the latter case was decided before the act of 1872 was passed. On a careful reading of the acts of 1872 and 1868, I am impressed with the belief that it was not the intent of the legislature to include county buildings under the head of "internal improvements," in the act of 1872; and in the case of *Osborne* v. *County of Adams*, 106 U. S. 181, 1 Sup. Ct. Rep. 168, Mr. Justice HARLAN, speaking for the court, refers to this question as still in doubt. But whatever view may be taken of this question, the recitals on these bonds are sufficient to bring them under the provisions of the act of 1868, which did authorize the issuing of bonds for county buildings, and therefore it answers no purpose to further discuss this point.

It results from the views above set forth, that the plaintiff is entitled to recover upon the coupons clipped from the court-house bonds an1 bridge bonds, and is not entitled to recover on the coupons clipped from the general expense bonds. Judgment will be entered accordingly.