THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v. THE FIRE ASSOCIATION OF PHILADELPHIA, Respondent.

The act of 1865 (Chap. 694, Laws of 1865), as amended in 1875 (Chap. 60, Laws of 1875), providing that an insurance corporation of another State seeking to do business here shall pay to the superintendent of the insurance department for taxes, fines, etc., an amount equal to that imposed by the "existing or future laws" of the State of its origin, upon companies of this State seeking to do business there, when such amount is greater than that required for such purposes by the then existing laws of this State, is not an unlawful delegation of legislative power.

*Barto* v. *Himrod* (8 N. Y. 483), distinguished.

The legislature has power to pass an act to take effect upon the happening of some future event, certain or uncertain, which, in its judgment, affects the expediency of the law.

The fact that the contingency upon which the operation of the act is made to depend is the action of the legislature of another State does not invalidate the act. It does not follow, therefrom, that the legislative discretion of such other State is substituted for our own.

*Clark* v. *Port of Mobile, Ala.* (10 Ins. L. J. 361), disapproved.

*It seems*, however, that the question of expediency may not be delegated, but must be settled definitely and finally by the legislature itself.

The said act is not repugnant to the provision of the Federal Constitution (Art. 14), declaring that no State shall "deny to any person within its jurisdiction the equal protection of the law." That provision relates wholly to persons rightfully within the jurisdiction, not to the terms and conditions on which alone they can come in.

A foreign corporation may not come or transact business within the jurisdiction except by permission, express or implied; the State may prohibit it entirely, or may impose conditions, on compliance with which only it may come.

Said provision, therefore, applies only to foreign insurance companies after they have performed the conditions upon which they are entitled to admission.

*It seems* that, even if the conditions were unconstitutional, the foreign corporation waives the objection when it accepts the conditions by coming in under them, and is estopped from raising it.

The constitutional difference between the rights of non-resident individuals and foreign corporations pointed out.

Said act is not violative of the provision of the State Constitution (Art. 3, § 20), declaring that "every law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object," as the condition imposed by the act is in the nature of a license fee.

The said act is not affected by the provision of the act of 1881 (§ 8, chap. 361, Laws of 1881) in reference to taxing certain corporations, companies and associations, which declares that the organization mentioned by the act shall thereafter "be exempt from assessment and taxation for State purposes," except as therein provided, as the exemption there is only from the general taxes for State purposes.

By a law of Pennsylvania it is provided that an insurance company of another State doing business in that State shall pay into the State treasury annually three per cent of the premiums received there during the year. *Held*, that said act of 1875 required of an insurance company of that State doing business here a payment to the superintendent of such sum as, with other payments, would make a full payment of three per cent on the premiums received by it; that if it had not paid the two per cent required to be paid by the State law (Chap. 465, Laws of 1875, as amended by chap. 359, Laws of 1876, chap. 138, Laws of 1878, and chap. 153, Laws of 1879), to the treasurers of the fire departments of the cities and villages, on all premiums received on property located therein, because there was no fire department in a particular locality to receive it, such amount must be added to the sum payable to the superintendent.

(Argued March 29, 1883; decided May 1, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, in favor of defendant, entered upon an order made February 3, 1883, directing such judgment on a case submitted under section 1279 of the Code of Civil Procedure.

The questions submitted were as to the constitutionality of the act chapter 694, Laws of 1865, as amended by chapter 60, Laws of 1875, and if constitutional as to the amount, defendant, a Pennsylvania insurance company, is liable to pay to the superintendent of the insurance department of this State under said act upon premiums received by it in this State.

Defendant had paid to the trustees of the Exempt Firemen's Fund in the city of New York two per cent upon the premiums received on property insured in that city, as required by the statutes. It also had paid to the State comptroller eight-tenths of one per cent on all premiums on business transacted in this State. It had also paid to the treasurers of fire departments of other cities and villages of the State $1,816.89, which as stated in the case was "all that was demanded of the de-

fendant, there being many villages in the State in which prop-
erty insured by the defendant had no fire department or fire
companies." The whole amount paid was $4,036.65. The
superintendent claimed that defendant was liable to pay to
the State three per cent on the gross sum received by it for
premiums on State business during the year aforesaid, which
percentage would amount to $5,885.10, less the sum so paid.

*Leslie W. Russell*, attorney-general, for appellant. The
legislature has the power to impose upon foreign corporations
doing business in this State such terms for the privilege granted
as it may deem proper. (*Liverpool Ins. Co.* v. *Mass.*, 10 Wall.
566 ; *Bank of Augusta* v. *Earl*, 13 Pet. 586 ; *Fire Dep't* v.
*Noble*, 3 E. D. Smith, 440, 452 ; *Fire Dep't* v. *Wright*, id. 453 ;
*People* v. *Imlay*, 20 Barb. 68 ; *Paul* v. *Virginia*, 8 Wall.
168 ; *Nathan* v. *Louisiana*, 8 How. 73 ; *Ducat* v. *Chicago*, 10
Wall. 410 ; *Conner* v. *Elliott*, 18 How. [U. S.] 591.) A State
may, in its discretion, prohibit foreign corporations from exer-
cising their corporate privileges within its jurisdiction. They
are not citizens within the meaning of section 2, article 4 of the
Constitution of the United States, which provides that " the
citizens of each State shall be entitled to all privileges and im-
munities of citizens in the several States," and their right to
do business in foreign States depends upon the assent of those
States which may be given on such terms as they please.
(*Paul* v. *Virginia*, 8 Wall. 168 ; *St. Louis* v. *Wehrung*, 46
Ill. 392; 48 id. 172 ; 92 id. 399 ; 94 id. 364; *Slaughter-
House Cases*, 16 Wall. 36, 81.) The license to do business
being a favor and not a right, the proffer of the terms, though
those terms could not be compelled because interfering with the
privilege of the citizen, once accepted, makes the conditions bind-
ing on the corporation, as constitutional rights created for personal
benefit may be waived. (*Embury* v. *Connor*, 3 Comst. 511 ; *Sher-
man* v. *McKeon*, 38 N. Y. 267 ; *Phyle* v. *Eimer*, 45 id. 103.)
And having waived the privilege the corporation will be estopped.
(*Vose* v. *Cockroft*, 44 N. Y. 415 ; *Cancemi* v. *People*, 18 id.
128; *Morse* v. *Home Ins. Co.*, 30 Wis. 496; 20 Wall. 445 ;

*State, ex rel. Drake,* v. *Doyle,* 40 Wis. 175 ; *State, ex rel. Continental Co.,* v. *Doyle,* id. 220 ; *Doyle* v. *Continental Co.,* 94 U. S. 535.) The object of this tax is, under section 20, article 3, of the Constitution, sufficiently designated. (2 R. S. [7th ed.] 1447, § 7 ; *People* v. *Nat. F. Ins. Co. of N. Y.,* 27 Hun, 188 ; *People, ex rel.* v. *Davenport,* 25 id. 630–632 ; *Mut. Ins. Co.* v. *Mayor,* 5 Sandf. 10 ; affirmed, 8 N. Y. 24 ; *People, ex rel.* v. *Supervisors,* 17 id. 235 ; *People, ex rel.* v. *Supervisors,* 27 Barb. 575–583, note *a.*) The court below erred in deciding that the act of 1875 was unconstitutional, in that it was an improper delegation of legislative power. (*Bank of Rome* v. *Vil. of Rome,* 18 N. Y. 38 ; *Starin* v. *Town of Genoa,* 23 id. 439 ; *Clarke* v. *City of Rochester,* 28 id. 605 ; *Bank of Chenango* v. *Brown,* 26 id. 467 ; *Matter of Gilbert El. Ry. Co.,* 70 id. 361, 374 ; *Vil. of Gloversville* v. *Howell,* id. 287 ; *Home Ins. Co.* v. *Swigert,* MSS. opinion ; *Locke's Appeal,* 72 Penn. St. 491 ; *Kerrigan* v. *Force,* 68 N. Y. 381.) The law of 1881, which is confessedly a substitute for the former methods of State taxation, does not affect any tax which those former methods did not affect. (*People, ex rel.* v. *Davenport,* 25 Hun, 630, 632 ; Ct. of Appeals, MSS., March 13, 1883 ; 2 R. S. [7th ed.] 1447, § 7.)

*Joseph H. Choate* for respondent. The act of 1865 is void, because it involves an improper delegation of legislative power. (*Clark* v. *Port of Mobile,* 10 Ins. Law Jour. 361.) The legislature neither must nor can transfer the power of making laws to anybody else, or place it anywhere but where the people have. (2 Locke on Civ. Gov. [ed. 1766] 273 ; Cooley on Taxation, 48 ; *Barlow* v. *Himrod,* 8 N. Y. 483 ; *Bradley* v. *Baxter,* 15 Barb. 122 ; *Thorne* v. *Cramer,* id. 112 ; *Foss* v. *City of Chicago,* 56 Ill. 354.) The act in question is in direct conflict with article 7, section 13, of the Constitution of 1846, which provides that every law which continues, imposes or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object. (Cooley on Taxa-

tion, 397.) The act of 1863 is in direct conflict with the first section of the fourteenth amendment of the Constitution of the United States. (*Missouri* v. *Lewis,* 101 U. S. 22; *Pearson* v. *City of Portland,* 69 Me. 278; *City of Portland* v. *City of Bangor,* 65 id. 120; *Northwestern F. Co.* v. *Town of Hyde Park,* 3 Biss. 480; *Bank of U. S.* v. *Devereux,* 5 Cranch, 61; *Detroit* v. *D. & H. P. R. Co.,* 43 Mich. 140, 147; *N. Y. C. & H. R. R. R. Co.* v. *Met. Gas L. Co.,* 63 N. Y. 326; *Matter of Roch. Water Co.,* 66 id. 413; *County of San Mateo* v. *So. Pac. R. R. Co.,* 13 Fed. Rep. 722.) The legislative department has not unlimited power to prescribe a class, or what companies shall constitute a class; classification must be with equal protection to all under the same circumstances. (*Bureau Co.* v. *Chicago, etc., R. R. Co.,* 44 Ill. 229; *Allhands* v. *The People,* 82 id. 234; *Hughes* v. *City of Cairo,* 92 id. 339; Cooley on Taxation, 128.)

FINCH, J. The legislation of the State relating to foreign insurance companies is challenged on this appeal as a violation of constitutional right. The act of 1875 (Chap. 60) in substance provides, that an insurance corporation of another State, seeking to do business here, shall pay to the superintendent of the insurance department for taxes, fines, penalties, certificates of authority, license fees and otherwise, an amount equal to that imposed by the State of its origin upon companies of this State seeking to do business there, when such amount charged is greater than our own. The evident purpose of the act is to treat the corporations of another State seeking to transact business here precisely as such other State should treat our own corporations seeking to do business there. It rests upon the idea that the comity due from one State to another is not required to be more than equal and reciprocal, and what is wholly matter of privilege may be granted or withheld upon conditions.

This legislation is assailed, first, upon the ground that it is an unlawful delegation of the legislative power, and the General Term have so held upon the authority of *Barto* v. *Him-*

*rod* (8 N. Y. 483). We do not think that case at all decisive of this. What was there denominated the school law came from the hands of the legislature, not as a law, but as a proposition. Whether it should be a law or not was precisely the question submitted to the popular vote. The legislature proposed the law, but left it to the people to enact. The process carried out and applied to all bills would have resulted in a complete abdication by the senate and assembly of their authority and functions. Instead of making laws they would simply have suggested them, reported them for consideration, but left the judgment upon them, the determination of their expediency and wisdom, to an authority outside of their own. As to the school law, the people were made the legislature, and left to decide whether the bill proposed should or should not become a law. This court held that the legislature, under the Constitution, could not so delegate its power, but was bound to determine for itself the expediency of the measure, and either enact or reject it. But nothing in that decision denied to the legislature the right to pass a law whose operation might depend upon, or be affected by, a future contingency. The opinions expressly conceded the existence of such power. It was not denied that a valid statute may be passed to take effect upon the happening of some future event, certain or uncertain. And this was said as to the character of such event, viz.: "The event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the expediency of the law; an event on which the expediency of the law in the judgment of the law-makers depends. On this question of expediency the legislature must exercise its own judgment definitively and finally." The statute before us fully answers this description. It came from the hands of the legislature a complete and perfect law, having at once a binding force of its own, and dependent upon no additional consent or action for its vitality and existence. The question of expediency involved in it was not delegated to any other tribunal, but settled definitively and finally by the legislature itself. It determined, as a con-

clusion proper and expedient, that foreign insurance companies, as the price of admission to our territory, should pay in taxes, license fees and the like precisely what the States which created them should impose upon our companies in excess of our usual rates as the price of admission to the foreign territory. That was the whole question involved. Nothing else in the proposed law remained to be settled as expedient or otherwise, and that question the legislature determined for itself, upon its own reasons and its sole responsibility. Neither the law nor its expediency depended upon the legislation of another State. It remained the law and its expediency was the same, whether other States legislated or not. If they did, the contingency arose which the law stood ready to meet; if they did not, it remained none the less the law, although no fact occurred to set it in operation. This court has steadily declined to push the doctrine of *Barto* v. *Himrod* beyond the point which it decided. In *Bank of Rome* v. *Village of Rome* (18 N. Y. 39) we sustained as constitutional an act conferring upon municipal authorities certain powers not to be exercised until the act had been approved by two-thirds of the tax payers. The distinction taken was that the law took effect immediately, and conferred the necessary power, but did not compel the village to act under it unless the tax payers so determined. The law was complete, although its operation depended upon a contingency, which might or might not happen. A similar distinction was taken in other cases. (*Starin* v. *Town of Genoa*, 23 N. Y. 439; *Bank of Chenango* v. *Brown*, 26 id. 467; *Clarke* v. *City of Rochester*, 28 id. 605.) While there were differences of opinion in these cases as to the precise grounds which distinguished them from *Barto* v. *Himrod*, there was an entire concurrence in the construction put upon the latter case, a construction which makes it inapplicable to the statute under consideration.

But it is argued that this act offends, although not in the same manner as the school law, by leaving the amount of the tax or fine to the legislative discretion of another State. The argument is, that the nature of the attempted legislation is

vicious; that what the amount of a tax, fine, penalty or license
shall be is essentially the direct and immediate effect of statutory
enactment; that the act in question does not determine it; that
it remits it to the legislature of another State by its enactments
to create or change the tax. Authority for this criticism is
found in a decision in Alabama (*Clark & Murrell* v. *The Port
of Mobile*, 10 Ins. Law Jour.) and in one in Indiana (id. 361).
But the whole argument rests on the single point that the
amount of the tax or fine imposed is not definitely fixed by
the terms of the statute, but depends above a certain rate upon
foreign legislation. Is it true that a fine or tax cannot be im-
posed unless its amount be stated in the law? And that, if
left to be determined by some other tribunal, thereby the legis-
lative power has been delegated? Laws define a multitude of
forbidden acts and impose fines and penalties not exceeding
certain amounts, but below those amounts left wholly uncer-
tain and committed to the discretion and judgment of judicial
officers or tribunals. It is quite certain, therefore, that the
legislature does not abdicate its functions and delegate its au-
thority when it imposes a fine or penalty without itself fixing
the amount, or when it leaves it to be fixed by some other tri-
bunal. But in the statute before us nothing is left to any-
body's discretion. That is certain which can be rendered
certain, and the act fixes the tax by reference to an ex-
trinsic fact which determines its amount in excess of a fixed
and established rate. Because that extrinsic fact is the legisla-
tion of another State, it does not follow that the legislative
discretion of such other State is in any manner substituted for
our own. The opinion in the case decided in Alabama turns
upon what appears to us to be this error. It asserts that the
law of which it speaks "authorizes in effect the legislature
of Mississippi, speaking through its statutes, which are the
subjects of extrinsic proof and not of judicial knowledge
in our courts, to fix by law the amount which the treasurer
of Alabama shall demand of appellants as a license tax to do
business in this State." A similar inference from our own
statute is pressed upon us in the case at bar. But if, when our

statute was passed, there had been in existence a law of Pennsylvania, imposing upon New York companies a license fee of three per cent, and because of that fact our legislature had enacted that all Pennsylvania companies should pay a license fee of three per cent, would that law have been a delegation of legislative authority to the State of Pennsylvania? Most clearly not, although the fact of the foreign law lay at the foundation of our legislative judgment and discretion. And if, within a month, the foreign law changed the impost to four per cent, and our own legislature, again ascertaining the fact, and because of it should change our tax to four per cent, would that be Pennsylvania legislation and not our own? And what would be certainly constitutional if done *seriatim*, by several and separate acts, does it become unconstitutional when the same precise and identical result, founded upon exactly the same legislative discretion, is accomplished by one? If so, a grave constitutional question is made to turn upon the bare form instead of the substance of legislative action. It seems to us that the whole difficulty arises from a failure to regard the foreign law, relatively to our own legislation, as simply and purely an extrinsic and contingent fact. Such fact, like any other, may justly influence and even occasion legislative action, without at all changing its nature, destroying its discretion or abridging its duties or its judgment. Most laws are made to meet future facts. They are complete when passed, but sleep until the contingency contemplated sets them in operation. A law which defines and punishes murder is none the less complete and authoritative although no murder be committed, and so the contingency it was framed to meet does not occur. Such contingency may sometimes be, instead of a certain and definite fact, one which is variable and changeable. The legislation suited to such a fact and adapted to such a future emergency may properly recognize its movable character, and be itself made flexible to the changing emergency, and this very characteristic is the product of legislative will and discretion rather than a surrender of it. If a foreign nation should impose upon American shipping onerous and severe harbor dues, with

a view of crippling our commerce and gaining for itself our carrying trade, and because of this Congress should pass an act imposing upon the vessels of such nation coming into our ports such and the same harbor dues as by their laws should be at the time charged upon our shipping, the act would be one of retaliation ; deliberately intended to operate according to the measure of the foreign law, treated as an existing or contingent fact; but could not justly be said to amount to an abdication by Congress of its legislative discretion and judgment.

Possibly we may get nearer to the ultimate point of the objection urged. That would seem to be that, while the legislature might, by a series of separate acts, each passed because of a then existing foreign law, follow its changes, yet it cannot do so by one act which adopts and enacts such future and contingent mutations. This doctrine requires us to hold that a law, so framed as to follow and recognize the changes of foreign legislation, and thereby incorporate such changes into its own operation, is a delegation of the legislative power and therefore inadmissible. We have found no authority for such a broad and general proposition. What has been said upon the subject is to the contrary, except, perhaps, inferentially by the ruling in specific cases. In *State* v. *Parker* (26 Vt. 365) the general subject was discussed and it was said : "If the operation of a law may fairly be made to depend upon a future contingency, then, it makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and legal one, not opposed to sound policy, *and so far connected with the object of the statute as not to be a mere idle and arbitrary one.*" And it was added : "One may find any number of cases, in the legislation of Congress, where statutes have been made dependent upon the *shifting* character of the revenue laws, or the navigation laws, or commercial rules, edicts, or restrictions of other countries." How true this is, and how dangerous would be a denial of the power to legislate in such manner, may be made more apparent by examples. The non-intercourse acts of the three years beginning with

1809 were made in terms dependent upon the action of France and England toward this country, and were to be revived or revoked according to the course of the foreign law, the effect of which was to be determined by the president and declared by his proclamation.   This instance is cited in *Bull* v. *Read* (13 Gratt. 90) as a law depending upon an uncertain future contingency, and an objection taken in the Federal courts that the power of legislation was transferred to the president was disregarded.   (*Cargo of Brig Aurora* v. *United States*, 7 Cranch, 386.)   In *Williams* v. *Bank of Michigan* (7 Wend. 540) it appeared that by an ordinance of Congress, passed in 1787, the governor and judges of the north-western territory were authorized to adopt and publish in the district such laws of the original States, both civil and criminal, as might be necessary and best suited to the circumstances of the district.   In 1805 Michigan was made a separate territory with a government "in all respects similar" to that provided for the north-western territory.   Under this legislation it was held that the governor and judges of Michigan could legally incorporate a banking institution.   The duty of making laws for the territory was saved only to the national legislature by its power of disapproval.   Congress has legislative power over the formation and procedure of the Federal judiciary.   It is provided (§ 914, U. S. R. S.) that the practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the Circuit and District Courts shall conform as near as may be to those existing at the time in like causes in the courts of record of the State within which such Circuit and District Courts are held.   And more specifically it is ordained that jurors to serve in the Federal courts shall have the same qualifications and be entitled to the same exemptions, and shall be designated by ballot, lot or otherwise, according to the mode of forming such juries then practiced in the State courts.   Coming to our own legislation, we notice that affidavits taken in another State may be effectual here if taken before any officer authorized by the laws of such State to take affidavits. (3 R. S. [6th ed.] 657, § 27.)   A deed may be recorded or

read in evidence in this State when made by a person residing without the State and in some other State or territory if proved, or acknowledged before any officer " authorized by the laws thereof " to take the proof and acknowledgment of deeds. (2 R. S. [6th ed.] 1140, § 5.)  And wills of personal estate, duly executed by persons residing out of this State, "according to the laws of the State or country in which the same were made," may be proved and established and become valid and effectual here.  These illustrations are not strictly analogous, but they tend to show how a law may be made to fit a changing event, and follow it, and adjust itself to it, through a series of future mutations, and those, too, made by foreign legislation, or the voluntary action of other bodies; and they indicate also the dangers of forbidding such discretion.  But it is said the doctrine thus asserted would permit one State to adopt the law of another State together with its future changes by one sweeping enactment; and, for an example, that New York might enact that the rate of interest here for the loan of money should be such and the same as that which should be from time to time prescribed by the law of Maine.  These are seeming, but in reality false analogies. They are pure cases of an abdication of its functions by the legislature and of an unwarranted delegation of its authority. But that is so because there is no dependent or causative connection between the domestic and the foreign law, as was said in *State* v. *Parker* (*supra*); and because, as was explained in *Barto* v. *Himrod*, the event upon which the law is made to take effect is not one on which the expediency of the law in the judgment of the law-makers depends.  In other words, no legislative judgment is involved.  Perhaps we can test the distinction in another way.  We may compare the law as to interest above-mentioned, and the one before us, in respect to their capacity, to be debated on the merits.  The former would have no merits and could not be debated.  The only discussion on its merits would be in Maine, and there it would be over its law, and that when enacted would become our law.  The debate upon the expediency of the particular rate to be charged

would be all there, and our legislature would form no judgment upon it and could not debate it. The only thing they could debate would be whether they should thus abdicate their own judgment and authority. But the law before us could be debated on the merits, and passed or rejected as the result of legislative judgment and discretion. On one side it could be argued that the proposed law was just and wise; that it gave needed protection to our own corporations going beyond our borders; that it aimed to produce equality of privilege; that unless the legislature remained in continual session the law must be adjusted to meet emergencies occurring during its recess; that the bill was framed to meet that emergency and was expedient on its own merits. On the other side it could be said that the measure would be inherently vicious because in the nature of retaliation; and a change might be made in the foreign State which we should be reluctant to follow. And to this the reply would come that as the tax involved did not touch or interfere with our general system of taxation, and was merely a license fee or price of admission to our jurisdiction, that it could properly be adjusted to the prices charged, and follow them whenever in excess of our established rates; and, if such excess should be taken away entirely, precisely the good result arrived at would be accomplished; corporations would freely pass both borders, paying only the equal rates of ordinary and just taxation. There is thus developed the clear and wide difference between the two laws. One has merits of its own; the other has none. The expediency of one is debatable; that of the other is not. The one is enacted *because* of the foreign law; the other only *according* to the foreign law. The one is passed for legislative reasons and out of a legislative discretion which the foreign law and its possible mutations engender; the other without any such reasons and with no reason whatever, but only through trust in a foreign reason. It seems to us that the difference is plain and decisive. The law before us preserves our normal and ordinary rate of taxation in any event and operates only when the foreign rate rises above it, and cannot be justly held unconstitu-

tional as involving a delegation of the legislative discretion. We should not so determine except in a very clear and certain case, and be careful not to restrain or hamper, without obvious necessity, the scope and range of the legislative authority. Legislation which retaliates is not inevitably vicious. It may sometimes be just, and often be necessary and even indispensable. In its inherent nature it is founded upon and adapts itself to the foreign law as a fact or contingency to be met. In any given instance it may be wise or unwise, but we are not ready to adopt a doctrine which denounces it as unconstitutional because it openly professes and declares itself to be precisely what it is, and fails to disguise itself in the form of separate acts following the mutations of the foreign law without confessing the fact. And that such legislation is not necessarily vicious, and may be in a given case entirely just and perfectly fair, will appear as we proceed to consider some further questions.

A second objection to the constitutionality of the act is founded upon article 14 of the Federal Constitution, and especially upon its final clause which commands that no State shall " deny to any person within its jurisdiction the equal protection of the laws." The argument here takes a wide range, and touches upon questions of supreme and vital importance as to the relations of the States to each other, and of each to the United States. Corporations are claimed to be " persons " within the meaning and protection of the clause referred to; its force and operation is carried beyond the limit indicated by the emergency from which it sprang; and it is asserted to forbid unequal taxation and condemn such legislation as that under consideration. But we think these grave questions are not before us, and the clause relied upon has no application to the rights of the defendant. It is a corporation, organized and existing under the laws of Pennsylvania; a creature of those laws, and beyond their jurisdiction, carrying its corporate life and existence only by sufferance and upon an express or implied consent. It could not come within our jurisdiction, or transact business within our territory except by

our permission either express or implied. The right of a State to exclude foreign corporations is perfectly settled and not open to debate. (*Paul* v. *Virginia*, 8 Wall. 168 ; *Bank of Augusta* v. *Earle*, 13 Pet. 586 ; *Liverpool Ins. Co.* v. *Massachusetts*, 10 Wall. 566 ; *Co. of San Mateo* v. *S. P. R. Co.*, 13 Fed. Rep. 722, FIELD, J.) Out of comity between the States has grown a right founded upon implied consent. Where a State does not forbid, or its public policy, as evidenced by its statutes, is not infringed, a foreign corporation may transact business within its boundaries and be entitled to the protection of its laws. But this right is still founded upon consent which is implied from comity and the absence of prohibition. But a State may prohibit. This State did prohibit and has steadily continued to prohibit the transaction of business within its limits by foreign fire insurance companies except upon certain express terms and conditions. By the act of 1853 as amended (2 R. S. [5th ed.] 762, § 54), fire insurance companies incorporated by any other State were forbidden "directly or indirectly to take risks or transact any business of insurance in this State," unless upon compliance with certain specified conditions. In 1871 (Chap. 388, § 5) the prohibition was repeated except upon the fulfillment of all the requirements of the laws then in force together with those named in that act. The law now under consideration was then in force, having been passed in 1865 (Chap. 694). The amendment of 1875 simply added a provision authorizing the superintendent to remit certain fees and charges. The situation then is this : The State, having the power to exclude foreign corporations, determines to do so unless they will submit to certain conditions. It meets the applicant on the border, forbidding admission, as it has a right to do, except on condition that it will fulfill all of the requirements of our statutes relating to foreign corporations, one of which is the very law here assailed. When the corporation comes in it agrees to the conditions. They become binding by its assent. The tax or license fee charged by the act of 1865 is one of these conditions. It is imposed as the price of permission to come within the jurisdiction, and not as

a tax upon one already within the jurisdiction. The four-teenth amendment, therefore, has no application. It can apply to foreign insurance companies only after they have performed the conditions upon which they are entitled to admission. Any other view of the case involves this absurdity: that the for-eign company may agree to pay the tax charged by the act of 1865 so as to get within our jurisdiction, and then refuse to pay it while insisting upon the right to remain. It cannot agree to conditions as the price of admission, and after having been admitted turn around and dispute them. Even if the conditions were unconstitutional, which cannot be said of the terms of the act of 1865, considered as conditions, the foreign company could waive the objection (*Embury* v. *Conner*, 3 N. Y. 511 ; *Sherman* v. *McKeon*, 38 id. 267 ; *Phyfe* v. *Eimer*, 45 id. 103) ; and does do so when it accepts the conditions by coming in under them, and is estopped from raising the question. (*Vose* v. *Cockcroft*, 44 N. Y. 415.) Even where the condition was a violation of the Federal Constitution and the Supreme Court of the United States so declared, they refused to prevent the State from excluding the offending company and revoking its license. (*Doyle* v. *Continental Ins. Co.*, 94 U. S. 535.) By that process, even in such a case, obedience could be compelled, at the peril of removal from the State. But in the case before us the condition imposed is not a violation of the Federal Constitution upon any construction of the final clause of the fourteenth article, for that relates wholly to persons within the jurisdiction, already there in fact and of right, and their treatment thereafter, and not at all to the terms and con-ditions on which alone they can come in. This view of the case renders of no importance the argument founded on the word "tax," and the distinction sought to be drawn between that and a license fee. Grant that it is properly denominated a tax, yet the payment of a specific tax may be imposed as a condition of assent to fire insurance within the State, and, as we have seen, has been so imposed by express and positive law. Its nature as a condition precedent is not altered by its name. The constitutional difference between the rights of

non-resident individuals and foreign corporations is fundamental and apparent. The citizen of another State has a constitutional right to come within our jurisdiction. The charter of the nation has secured him that right, and we cannot exclude him nor clog his right with conditions, unless in exceptional cases under the police power. But foreign corporations, artificial beings, the product of a law not our own, have no constitutional right to pass their own borders and come into ours. The Federal Constitution has neither granted nor secured any such right. We may exclude absolutely, and in that power is involved the right to admit upon such conditions as we please. Until they are within our jurisdiction, the final clause of article 14, by its own terms, does not apply. While they stand at the door bargaining for the right to come within, they may decline to come, but cannot question our conditions if they do. How then is the legislation vicious which proposes to treat them precisely as their own State treats our corporations similarly situated? Is exact equality unfair? Must comity become magnanimity or injustice? If we owe courtesy to sister States, do we not also owe protection to our own corporations, formed and fostered under our law? Is it vicious to insist for them upon precise equality of treatment? These questions our legislature answered. The inquiry was within the just range of their discretion. This court, at least, is bound to assume, and finds no difficulty in assuming, that they answered it wisely and justly.

A third ground of objection may be more briefly dismissed. Reference is made to article 3, section 20 of the State Constitution, which provides that " any law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object." We are of opinion that this provision does not relate to a tax imposed as a condition upon a foreign insurance company, and, therefore, in fact in the nature of a license fee, and that the tax covered by the constitutional provision is one general in its provisions

and co-extensive with the State. (*People* v. *Supervisors of Chenango*, 8 N. Y. 326.)

The point taken as to the effect of the law of 1881 (Chap. 361, § 8) is substantially disposed of by our decision in *People, ex rel. Westchester F. Ins. Co.*, v. *Davenport* (91 N. Y. 574). We there held that the exemption under the law of 1880 was from the general taxes levied for the general purposes of the State. The same construction must apply to the act of 1881.

The final question raised is over the amount to be collected. We think the act requires, in the present case, a full payment of three per cent upon the premiums received, and if any part of it has not been paid, because there was no fire department in a particular locality to receive it, such amount must be added to the sum payable to the superintendent. He must receive such sum as with the other payments will equal the three per cent required.

The judgment of the General Term should be reversed and judgment entered for the plaintiffs for $1,848.45, with interest from January 15, 1882, with costs.

All concur.

Judgment accordingly.