THE LONG ISLAND RAILROAD COMPANY, Plaintiff, *v.* DEPARTMENT OF LABOR OF THE STATE OF NEW YORK and Others, Defendants.

Supreme Court, Albany County, January, 1931.

*Joseph F. Keany* [*Alfred A. Gardner* and *Louis J. Carruthers* of counsel], for the Long Island Railroad Company.

*Douglas Swift* and *Austin J. McMahon*, for the Delaware, Lacka-wanna and Western Railroad Company.

*H. T. Newcomb* [*Thomas L. Ennis* of counsel], for the Delaware and Hudson Railroad Corporation.

*Herbert A. Taylor*, for Erie Railroad Company.

*Herbert W. Smith*, for Lehigh Valley Railroad Company.

*Jacob Aronson* [*Frederick L. Wheeler* and *Frank A. McNamee, Jr.*, of counsel], for the New York Central Railroad Company.

*Charles M. Sheafe, Jr.*, for the New York, New Haven and Hartford Railroad Company.

*Alfred A. Gardner*, for the Pennsylvania Railroad Company.

*Cravath, de Gersdorff, Swaine & Wood* [*J. C. Millard* of counsel], for the Staten Island Rapid Transit Railway Company.

*Hamilton Ward, Attorney-General* [*Claude T. Dawes, Wendell P. Brown* and *Amos D. Moscrip* of counsel], for all State Departments, except the Transit Commission and Public Service Commission.

*Charles G. Blakeslee* [*Russell B. Burnside* of counsel], for the Public Service Commission.

*George H. Stover,* for the Transit Commission.

*De Witt Clinton,* for the Grade Crossing and Terminal Station Commission of Buffalo, N. Y.

*Frank P. Malpass* [*James C. Tormey* of counsel], for Syracuse Grade Crossing Commission.

*Guy B. Moore, District Attorney of Erie County* [*Otto M. Buerger* of counsel].

*John T. Delaney, District Attorney of Albany County* [*David Wanger* of counsel].

*Harry M. Stacy, District Attorney of Oswego County* [*C. J. Gorman* of counsel].

*Hackenburg & Swartz* [*Frank Pedlow* of counsel], for District Council of New York City of United Brotherhood of Carpenters and Joiners of America.

*Frank X. Sullivan,* for New York State Federation of Labor.

STALEY, J. The above actions have been brought by various railroad companies against officers of the State of New York, to enjoin the enforcement of article 8-A of the Labor Law which relates to wages and hours of labor in connection with work on railroad grade crossing elimination, on the ground that the article is unconstitutional.

Complaints and answers have been served in all of the actions, and motions are now made by the plaintiffs for preliminary injunctions. Defendants ask for judgment on the pleadings, dismissing the complaints. Plaintiffs urge consideration of judgment on the pleadings in their favor under rule 112 of the Rules of Civil Practice.

Fortunately, many of the questions in relation to grade crossing elimination have been settled by judicial decisions of the highest courts, so that the motions now made involve but a single proposition of novelty.

The full force and effect of the claims of the parties, and the precise bearing of the objections made by the plaintiffs to the enforcement of article 8-A of the Labor Law may be better understood after a brief review of the history of railroad grade crossing elimination in this State.

A separation of grades of railroads and highways has become an established policy throughout the United States. The congestion of traffic, brought about by the motor vehicle, the increase

of population and its marked concentration in and near cities and villages, together with the expansion of trade, has stimulated great activity in this respect.

The State, of course, is vitally concerned in elimination of grade crossings to increase safety of travel and for economic reasons as well. It is generally admitted that highway improvement is a necessary factor in the general development of the country.

The railroads, too, are vitally concerned from a purely economic point of view. The mounting number of grade crossing accidents entails large expenditures in the payment of damages and legal expenses. Besides this, the railroads must pay out large sums for wages of gatetenders and flagmen, safety devices and equipment.

The Public Service Commission in its Report for 1923 (Vol. 1, p. 31) had this to say: " To protect a crossing adequately costs a substantial sum per annum. If gates are adopted there is the cost of installation, which may vary from $1,000 to $2,500. To maintain attendants at these crossings for each of the 24 hours within the day will cost from $200 to $300 per month. 767 crossings are now protected by gates. To protect the remaining 3,233, assuming that the present protected ones are included within the above named 4,000, will require an initial outlay for installation alone of approximately $5,657,750, and an annual operating charge for protection of $1,000,000. Such charges as these are now wholly borne by the railroad corporations. Being a direct part of operating expenses, they must ultimately be borne by the public in the rates paid for transportation. Whether the public would prefer to bear this charge in this manner or in some other way is an open question. As eliminations progress, the charges will decrease, assuming that the rates of wages remain substantially constant."

Possibly, the greatest loss to the railroads arising from crossings at grade is the interference with rapid transit. Urban and inter-urban rapid transit is practically impossible in communities where grade crossings are numerous.

The absence, in our public and political affairs, of any effort on the part of the railroads to resist improvements along this line, indicates that the railroads are content to co-operate with the public authorities.

In 1897, sections 60–69, inclusive, were added to the Railroad Law by chapter 754 of the Laws of 1897. This chapter was known as the Grade Crossing Law. It was intended to provide a complete scheme regulating all kinds of crossings over old or new streets. The control of the manner of constructing crossings was committed to the Railroad Commissioners. Where a change was made

in an existing crossing, the railroad was required to pay fifty per cent, the municipality twenty-five per cent and the State twenty-five per cent of the cost.

Under this law progress was slow. The statute was adapted to the elimination of grade crossings in the country districts, but, apparently, it was not sufficiently flexible to meet the complex problems of elimination arising in cities. Buffalo had a special act. New York city carried on the work of elimination under special acts. Besides, appropriations for the work were small. Up to 1908 they were as follows (See Report, Public Service Commission, First District, 1909, vol. 1, p. 286):

| | |
|---|---|
| Laws of 1898, chapter 217 | $100,000 |
| Laws of 1899, chapter 570 | 100,000 |
| Laws of 1900, chapter 418 | 100,000 |
| Laws of 1901, chapter 644 | 100,000 |
| Laws of 1903, chapter 600 | 75,000 |
| Laws of 1904, chapter 729 | 150,000 |
| Laws of 1905, chapter 700 | 200,000 |
| Laws of 1905, chapter 701 | 100,000 |
| Laws of 1906, chapter 686 | 250,000 |
| Laws of 1907, chapter 578 | 300,000 |

Appropriations for succeeding years were as follows:

| | |
|---|---|
| 1910 | $250,000 |
| 1911 | 250,000 |
| 1912 | (no appropriation) |
| 1913 | (no appropriation) |
| 1914 | (no appropriation) |
| 1915 | $552,000 |
| 1916 | 175,000 |
| 1917 | 250,000 |
| 1918 | 100,000 |

The total amount appropriated to 1925 was a little over $4,000,000.

One of the early difficulties was that the money to be paid by the State could not be used until the work was completed, thus requiring the railroads to advance the full cost.

Amendments to the Railroad Law permitted the State Commission of Highways to petition for elimination of grade crossings on State or county highways to be constructed or improved. In such cases the State's portion of the expense was payable out of highway funds.

The general situation of grade crossing elimination in 1923 is set forth in the Report of the Public Service Commission for that year (Vol. 1, p. 28):

" The grade crossing problem grows more serious constantly. The toll of lives taken each year on account of this condition is appalling. It is much greater than the number of accidents resulting from train operations, such as collisions, derailments, etc. For the last reporting period there were 719 accidents, which resulted in the death of 91 persons and the injury of 474. In no year in the history of the Commission has there been such a loss of life as this due either to collisions, derailments or grade crossing accidents.

" The work of eliminating grade crossings has progressed as rapidly as the available funds and the necessary studies will permit, but the results are feeble when compared with the magnitude of the task of thorough elimination. Gates, flagmen and automatic devices of various kinds have been installed voluntarily and on order or request of the Commission. Undoubtedly these expedients have helped to reduce the number of accidents. It is noticeable that a large number of accidents have resulted from a collision of a vehicle on the highway with the sides of the trains, in many cases these collisions taking place with cars rather than with the locomotive. It should also be noted that it is not the so-called blind crossing (one in which the view obtainable of approaching trains is obscured), at which accidents most frequently occur. It has been chiefly the open crossing in open country where the traveler on the highway has disregarded a safe speed in approaching the crossings notwithstanding the numerous safeguards giving adequate warning that a crossing is immediately in advance. The tables which have been prepared show clearly the types of accidents which have occurred.     *     *     *

" Complete elimination seems to be the only positive remedy, but this will cost a prodigious sum. There are 8,205 grade crossings of steam railroads within the State. No definite survey has ever been made to determine the particular character of each of these crossings. They may be divided into the following general classes: city and village streets; improved state and county highways under the jurisdiction of the Department of Public Works, Bureau of Highways; improved county highways; and town highways. Most of the first class are now protected by either gates, flagmen, or automatic warning devices. Of the second class the more prominent and densely traveled have protection of one form or another aside from the usual warning signs. The last two named are practically unprotected. There is another division as

to type, viz., the trunk line railroads, and the short line railroads. The Commission's observations of a number of years suggest that there are not less than 4,000 crossings that should be eliminated as speedily as possible. Of the remainder, it is doubtful whether complete elimination would ever be required. It is true that accidents may occur at such crossings, but the cost of their elimination would seem to be out of proportion to the traffic sustained by the highways in question.

" The present experience of the Commission indicates that to eliminate the 4,000 crossings mentioned, not less than an average of $100,000 per crossing must be expended. When one considers the tremendous costs necessary to accomplish the elimination of crossings in cities such as Syracuse, Elmira, Binghamton, Cortland, etc., it is apparent that the average cost must of necessity be high. $400,000,000 would therefore be required to accomplish this work, and the share of the State under the present statutory division could not be less than $100,000,000. It would probably be more than this amount, as many of the crossings included within the 4,000 are under the jurisdiction of the Bureau of Highways, in which case the State now pays one-half of the cost.

" While the money cost is very great, another important factor must be considered. To eliminate 100 crossings per annum would not only tax the financial ability of the railroads and the public, but their physical resources as well. Under the statute, in all cases excepting those pertaining to highways under the control of the State Department of Public Works, the municipality in which the crossing is located pays one-quarter of the cost of an elimination. The inability of the municipalities to pay these costs has been found to deter them from urging eliminations.

" At this rate not less than 40 years would be required in which to remove the present most serious menaces to human life. The problem, therefore, is essentially one of protecting human life. The most effective and practical means now known for such protection is the use of gates, but even these frequently fail to prevent accidents. It has been found imperative in many cases to construct certain barriers in such a manner as to practically wreck a vehicle in order to prevent it from attempting to cross when it is improper to do so. It has been suggested that the continental method of maintaining the gates closed except when necessary to open them in order to permit the passage of vehicles might be adopted. While this might be possible in the case of certain highways, it would be distinctly unsatisfactory on the densely traveled highways, especially where they cross railroads on which heavy traffic occurs. There are not many of such crossings, however,

and this suggests that they may be the first to be eliminated, provided the necessary funds may be made available."

In 1925 the People of the State adopted an amendment to the Constitution (Art. VII, § 14) authorizing the creation of a debt of $300,000,000 for the elimination of grade crossings. It was contemplated by this amendment that advances might be made by the State to aid the railroads. The expense of eliminations was there declared to be ultimately borne twenty-five per cent by the State, twenty-five per cent by the municipality and fifty per cent by the railroad.

This constitutional amendment was amended in 1927 whereby it was provided that fifty per cent of the cost of eliminations shall be borne by the railroad company and the remaining fifty per cent shall be borne by the State, the county or the city in such proportion as shall be determined by law.

A Grade Crossing Elimination Act was passed by the Legislature of 1926 (Laws of 1926, chap. 233) and this act was amended by chapter 445 of the Laws of 1927.

A new Grade Crossing Elimination Act was passed in 1928 (Laws of 1928, chap. 678) and the former statutes therein repealed.

The 1928 act applied to all grade crossing eliminations, except where other funds were available, where the expense thereof shall be paid from the proceeds of bonds issued pursuant to section 14 of article VII of the Constitution outside of the cities of New York, Buffalo and Syracuse.

A procedure is therein provided for the designation of grade crossings to be eliminated and the power of designation is vested in the Public Service Commission after due hearing and consideration. The elimination order of the Commission shall also determine the manner in which the elimination work shall be carried on and direct the preparation of plans, specifications and estimates of cost therefor.

When plans for eliminations designated are approved the railroad corporation shall perform the work, exclusive of the approaches, and the Department of Public Works shall perform the work relating to the approaches, unless the Commission shall direct the railroad corporation or the county to carry out the construction of such approaches. The Commission may also direct upon request of the railroad corporation that the Department of Public Works perform the work directed by the law to be done by the railroad corporation.

The Commission may direct that the work be done by contract or by direct employment of labor and purchase of material, or

partly by one method and partly by the other and may limit the amount to be expended without contract.

The cost of all eliminations pursuant to the provision of this act, as amended by chapter 461 of the Laws of 1929, shall be borne as follows: Forty-nine per centum by the State, one per centum by the county or counties in which the crossing is located and fifty per centum by the railroad corporation or corporations affected thereby. The proceeds of the bonds issued pursuant to the constitutional amendment were to be used in the first instance to pay the entire expense of the elimination, unless the railroad corporations elect to pay directly out of their own funds the whole or any part of the expense to be borne by them.

Provision was made for accountings from time to time and payment as the work progressed out of the State funds and also for repayment necessary to make adjustment in the proportionate shares and to reimburse the State for advances. In case the amounts allocated to the railroad were not paid when due they become a paramount lien upon its property and are assessed and collected in the same manner as other taxes. Appeals to the courts were authorized from all orders and decisions under this act.

Similar provisions, with appropriate adjustments, are contained in the elimination acts for crossings within the jurisdiction of the Transit Commission (Laws of 1928, chap. 677); of the Buffalo Commission (Laws of 1928, chap. 679) and of the Syracuse Commission (Laws of 1928, chap. 825, amdg. Laws of 1926, chap. 439).

In 1930 the Legislature enacted chapter 804 of the Laws of 1930 which added article 8-A to the Labor Law. By this enactment all grade crossing elimination work, where the State or its civil divisions are liable for a proportion of the cost of the work was declared to be public work and the eight-hour working day and prevailing wage provisions were made applicable to such work.

It is this statute that is challenged in the motions herein for injunction and judgment on the pleadings.

The complaints and answers, for the practical purpose of the decision herein, are substantially alike.

The plaintiffs, in their complaints, after setting forth several formal allegations, allege the enactment of chapter 804 of the Laws of 1930, and set forth in extenso article 8-A which was added to the Labor Law. Briefly stated, this article provides that all work of every kind upon the elimination of railroad grade crossings for the cost of which the State or its civil divisions are liable in any proportion, is declared to be public work, and that wages and hours of labor of workmen employed on such work shall be subject to article 8 of the Labor Law (as amd.) and that every contract for

such elimination work shall contain a stipulation that no workman shall be permitted or required to work more than eight hours in any one calendar day, except in cases of extraordinary emergency. It is further provided that the wages to be paid for such day's work shall be not less than the prevailing rate for a day's work in the locality where the work is performed, and that every contract for such elimination work shall contain a stipulation to that effect. Provision is made for the enforcement of the article by civil and criminal proceedings.

Article 8 of the Labor Law is also set forth in the complaints, at length. By article 8, provision is made for a determination of the " prevailing rate of wages " by the Industrial Commissioner, and for a judicial review of his determination.

Allegations then follow setting forth the number of grade crossings on each railroad; the estimated cost of elimination without reference to the wage and hours of labor provisions of article 8-A; the estimated cost of the share of the railroads; and a statement that the railroads' share of the cost of elimination will be greatly increased by the enforcement of the wage and hours of labor provisions.

It appears from the complaints that a large number of orders for the elimination of grade crossings have been made by the Public Service Commission where no work has been performed nor contracts let, and that if these orders are carried out the wage and hours of labor provisions will apply.

It is further alleged that the Public Service Commission will compel compliance with article 8-A. In this connection an order of the Public Service Commission has been made and served upon the railroads governing the letting of contracts for grade crossing elimination and requiring that the contracts for the work contain a stipulation complying with the wage and hours of labor provisions of the statute.

Plaintiffs further allege that the enforcement of article 8-A will subject them to a multiplicity of suits; that they have no adequate remedy at law; and that they will be subjected to irreparable loss.

They specify their claims that article 8-A is invalid and unconstitutional as follows:

1. That it abridges the privileges and immunities of plaintiffs, deprives plaintiffs of their property without due process of law and denies to plaintiffs the equal protection of the laws, in violation of section 1 of the 14th Amendment of the Constitution of the United States and sections 1 and 6 of article 1 of the Constitution of the State of New York.

2. That it deprives plaintiffs of liberty of contract.

3. That it sets up a standard for the payment of wages which is vague, uncertain and indefinite.

4. That, assuming the standard is capable of ascertainment, it compels plaintiffs to pay, and to enter into contracts to pay, wages according to the standard before the same is ascertained.

5. That it conflicts with the Federal Hours of Service Act and the Railway Labor Act, whereby the Congress of the United States has entered the field of legislation as to hours of service and wages of employees of railroads engaged in interstate commerce.

Plaintiffs demand judgment that article 8-A be declared unconstitutional and void and that an injunction issue.

The defendants by their answers admit most of the material allegations of the complaints.

By their answers and the stipulations for their amendment in open court upon the argument herein, the defendants admit that there will be increase in cost of grade elimination work if compliance with the requirements of article 8-A of the Labor Law be exacted, and where directed to perform the work by direct employment of labor that the plaintiffs will be required to do some work by its regular employees and that these employees or certain groups of them have entered into agreements with plaintiffs in accordance with the provisions of the Railway Labor Act, which agreements are now in effect and fix the rate of wages, hours of work and working conditions of such employees.

The pleadings have been framed and the papers on the motions have been drawn, so as to facilitate the decision of the main proposition involved without any embarrassing questions of procedure. Indeed, counsel have stated that such has been their purpose, as the exigencies of the present situation of grade crossing elimination requires a determination of the validity of article 8-A of the Labor Law with all convenient speed.

It further appears from the complaints that five of the plaintiffs are New York corporations, three Pennsylvania corporations and one incorporated in Connecticut, Rhode Island and Massachusetts.

At the very outset it appears that several very vital questions incidentally involved have been definitely settled.

The State, by virtue of its police power, may compel the elimination of grade crossings and impose the cost thereof wholly upon the railroads. (*Missouri, K. & T. Railway Co.* v. *Oklahoma,* 271 U. S. 303; *New York & N. E. R. R. Co.* v. *Bristol,* 151 id. 556.)

On the other hand, the State may use its funds in aid of such elimination. (*Lehigh Valley R. R. Co.* v. *Canal Board,* 204 N. Y. 471, 475.)

Undoubtedly, the work of grade crossing elimination is public

in so far as it promotes a public object. From the standpoint that it promotes the private advantage of the railroad, the work is, in a sense, private. It is none the less public because it promotes private advantages.

However, it does not appear to me that the case turns upon mere definitions of "public work."

It is settled that the State may itself enter into contracts providing for the payment of the prevailing rate of wages and an eight-hour working day. The State may require municipal corporations, which are mere instrumentalities of the State, to enter into like contracts. The right to freely enter into contracts is protected by the fundamental law, but it is a right possessed by the State within the limits provided by the Constitution as well as by the private citizen or corporation. Provisions in contracts made by the State in this respect are not an exercise of the police power, but are mere terms deemed beneficial to it, which those willing to contract with the State or its instrumentalities must accept, if they contract at all. (*Campbell* v. *City of New York*, 244 N. Y. 317; *Atkin* v. *Kansas*, 191 U. S. 207.)

The railroads claim that they are compelled to enter into contracts providing for an eight-hour working day and the payment of the prevailing rate of wages which increases the cost of the work for which they must pay a part. Thus, they claim their freedom of contract is impaired and their property taken without due process of law.

Arguments have been advanced involving the rights of the State under the police power, the power to regulate public work, the reserved power of the Legislature to amend, alter or repeal corporate charters, and the supremacy of Federal legislation regulating interstate commerce.

*First.* Is it possible to sustain the hours of labor and wage provisions as a valid exercise of the police power?

That the State may, under the police power, improve its highways and preserve the safety and convenience of its citizens by compelling the railroads to eliminate grade crossings is not open to question at this time. (*Erie Railroad Co.* v. *Board of Public Utility Comrs.*, 254 U. S. 394; *Lehigh Valley Railroad* v. *Commissioners*, 278 id. 24.)

Such compulsion may go to the extent that it would lead to bankruptcy of the railroad, providing the improvement reasonably accomplishes its object. But under the guise of an improvement the railroads cannot be compelled to accomplish some other purpose not reasonably incident to the main object. (*Lehigh Valley Railroad* v. *Commissioners*, 278 U. S. 24.)

In requiring the elimination of grade crossings the regulation of hours of labor or rate of wage is no part of the project, nor is it necessarily or reasonably incident thereto in accomplishing the result.

May the State under its general police power, whereby it may conserve the health, safety and welfare of its citizens, regulate the hours of labor and rate of wage of those engaged in grade crossing elimination?

This subject is not a new one and, I think, the limits of regulation in this respect have been generally defined.

As to hours of labor, where there is a reasonable relation between hours of labor and health, safety and welfare of a particular class of workmen, then regulation under the police power may be sustained.

Such a relation has been held to exist in cases of workers in mines (*Holden* v. *Hardy*, 169 U. S. 366), but not in the case of bakers (*Lochner* v. *New York*, 198 U. S. 45). It exists in the case of women (*Muller* v. *Oregon*, 208 U. S. 412), employees in factories (*Bunting* v. *Oregon*, 243 U. S. 426), and children (*Sturges & Burn* v. *Beauchamp*, 231 U. S. 320).

As to wages, it is generally held that a minimum wage regulation is unconstitutional. (*Adkins* v. *Children's Hospital*, 261 U. S. 525; *Murphy* v. *Sardell*, 269 id. 530; *Donham* v. *West-Nelson Mfg. Co.*, 273 id. 657.)

There is nothing peculiar in the work of grade crossing elimination, as affecting the health, safety or welfare of those employed in such work, different from workers generally. For that reason the provisions here in question cannot be sustained as a valid exercise of the general police power of the State.

*Second.* May the State under its power to regulate public work, compel compliance with the provisions ·in question?

Great stress has been laid on the facts that the grade crossing elimination is public work, and that the State has the right to fix wages and hours of labor for its servants and the servants of civil divisions of the State, and of contractors with the State and its civil divisions. (*Campbell* v. *City of New York*, 244 N. Y. 317.)

There can be no question that the State may regulate hours of labor of its servants and the servants of its instrumentalities, which are mere creatures of the State, and may also regulate the wages and hours of labor of those who are not strictly its servants but who are engaged by contract to perform public work. Such regulations are made for those who are willing to accept them by entering the public service or contracting to do public work. (*Campbell* v. *City of New York*, 244 N. Y. 317.)

That the State may impose conditions for hours of labor and rate of wages in its contracts for public work flows from the right of the State to dictate the terms of its contracts and which are imposed only upon those who voluntarily accept such terms. That the State may compel municipal corporations to enter into similar contracts flows from the right of the State to control its instrumentalities.

This power does not rest solely upon the public character of the work, although such character may be one of the elements essential to the existence of the power.

While the Grade Crossing Elimination Act (Laws of 1928, chap. 678) directs that the railroad corporation shall perform the work, exclusive of the approaches, and that the railroad corporation may let the necessary contracts therefor under the direction of the Public Service Commission, and that the Commission may direct that the work be done by contract or by direct employment of labor, the whole scheme of the law deals not with a purely private right but with a project that is pregnant with public interest.

" The whole matter is a public undertaking in behalf of the welfare of the people of this State, * * * in which the railroads are to pay a part of the cost." (*Transit Commission* v. *Long Island R. R. Co.*, 253 N. Y. 345, 350.)

" It belongs to the State * * * to prescribe the conditions upon which it will permit public work to be done in its behalf. No court has authority to review its action in that respect." (*Atkin* v. *Kansas*, 191 U. S. 207, 222.)

The statute makes the railroad corporations the agents of the State, under the direction and supervision of its public departments, to carry out the work. Such direction, however, does not alter the character of the work nor affect its public benefits. Many reasons suggest themselves as to the propriety of this method when it is considered that this work must be performed, without interference with railroad operation.

The Legislature might have directed that the work be done entirely by the State or by its municipalities. At any rate, in my judgment, the work is of such a public character that the State may legally prescribe the conditions under which it directs and permits it to be performed.

*Third.* May the State compel compliance with article 8-A of the Labor Law, by virtue of its reserved power to alter, amend and repeal corporate charters?

This power has been reserved to the State since 1827 under the Revised Statutes and since 1846 under the State Constitution.

The precise limits of this power have never been specifically

defined. A review of the authorities discloses that each case rests largely on its own facts. (Limitations of the Power of a State to Repeal Charters, etc., 44 Am. Law Reg. [N. S.] 1.)

The right to alter and repeal charters of corporations which has been reserved by the States is the result of the public alarm caused by the decision in the *Dartmouth College Case* (4 Wheat. 518), declaring that corporate charters were contracts and could not be controlled or destroyed unless power for that purpose be reserved. (*Lord* v. *Equitable Life Ins. Society*, 194 N. Y. 212.)

In reserving power to alter and repeal corporate charters, in view of the conditions existing at the time immediately following the *Dartmouth College* decision, there can be no doubt that the Legislature intended to make the reservation as broad and comprehensive as possible.

One limitation well settled is that the property of the corporation which has been acquired by it cannot be taken away by the repeal of a charter. (*Mayor, etc., of New York* v. *Twenty-third Street R. Co.*, 113 N. Y. 311.)

There is no right to change the fundamental character of the corporation. (*Buffalo, etc., R. R. Co.* v. *Dudley*, 14 N. Y. 336, 348.)

The alteration must be consistent with the scope and objects of the corporation as it was originally constituted. (*Mayor, etc., of New York* v. *Twenty-third Street Ry. Co.*, 113 N. Y. 311, 317.)

In general it has been said that under the reserved power the Legislature may impose upon railroad corporations such additional burdens and restrictions as the public good may require. (*People ex rel. Kimball* v. *Boston & Albany R. R. Co.*, 70 N. Y. 569; *Albany Northern R. R. Co.* v. *Brownell*, 24 id. 345.)

And alteration and amendment must be reasonable. (*Shields* v. *Ohio*, 95 U. S. 319, 324, 325; *Mayor, etc.,* v. *Twenty-third Street Ry. Co.*, 113 N. Y. 311, 317.)

This rule is applied in rate cases. Although a public service corporation may be subject to the reserve power, rate regulation must be reasonable. (*Lake Shore, etc., Ry.* v. *Smith*, 173 U. S. 684.)

Reasonableness may, therefore, be accepted as a guiding principle.

What is reasonable will depend upon the circumstances of the particular case. The application of the principle is illustrated by the following cases: *Portland & Rochester R. R. Co.* v. *Deering* (78 Me. 61); *Railway Co.* v. *Philadelphia* (101 U. S. 528, 539); *Mayor, etc., of Worcester* v. *Norwich, etc., R. R. Co.* (109 Mass. 103); *Sioux City Street R'y. Co.* v. *Sioux City* (138 U. S. 98); *Sinking Fund Cases* (99 id. 700); *Holyoke Co.* v. *Lyman* (82 id. 500); *Miller* v. *State* (Id. 478); *Looker* v. *Maynard* (179 id. 46).

In the case at bar it appears that in the interests of safety the

State has united with the railroads to eliminate grade crossings because of the dangers and interference with public use of streets and highways. Any adequate and comprehensive plan to be carried out by the railroads within a few years would tax their financial resources to an extent that might seriously interfere with their proper development and usefulness. The State has, therefore, justly, but still voluntarily, pledged itself to pay a substantial proportion of the cost of elimination, and in the first instance to advance the share of the railroads if necessary, to be later repaid as the bonds of the public debt become due. What might be unreasonable were the railroads to pay the whole cost is hardly a test in a situation where the State pays a substantial part.

The policy of the State in the expenditure of public moneys for labor has been to pay the prevailing rate in the locality for a day's labor of eight hours. To apply that policy to grade crossing elimination where the State pays a substantial part of the cost does not appear to be unreasonable.

It is claimed that the cost will be increased but it does not appear how much. The matter is left to inference, and the inference, in the nature of things, is that it cannot be very great in comparison with the substantial contribution of the State, which, of course, increases as the cost increases.

If the cost is increased it may be regarded as the price the railroads pay for State aid, reasonably imposed by the State under its reserved power. (*Mayor, etc.,* v. *Twenty-third Street Ry. Co.,* 113 N. Y. 311.)

The authority of the Legislature to exercise this reserved power applies only to corporations whose charters are a grant from the State of New York and thereby subject to the reservations.

Some of the plaintiffs herein are foreign corporations and the status of their operation in this State is not fully disclosed by the pleadings. Whether they are subject, under the circumstances of their operation here, to such legislative authority cannot now be determined.

These foreign corporations may operate domestic railroads and continuous lines may be made up by operation through lease or consolidation. The foreign corporations may also have permission to build and operate railroads in this State by charter (*Matter of Townsend,* 39 N. Y. 171, 175 and 185), and by act of the Legislature subject to alteration or repeal. (*Purdy* v. *New York & New Haven R. R. Co.,* 61 N. Y. 353.)

Foreign corporations sometimes gain control of domestic railroads by the acquisition of their capital stock. (*Smyth* v. *Asphalt Belt R. Co.,* 292 Fed. 876.)

Such corporations are permitted by comity to operate within the State. (*People* v. *Fire Association of Philadelphia*, 92 N. Y. 311; affd., 119 U. S. 110.)

It does not lie with any foreign corporation to complain that it is subjected to the same law as a domestic corporation. (*Horn Silver Mining Company* v. *New York*, 143 U. S. 305, 315.)

Foreign transportation corporations engaged in interstate commerce are not exempt from local regulation applied to domestic corporations of the same class where there is no direct burden imposed upon interstate commerce. (*Southern Railway Co.* v. *Greene*, 216 U. S. 400; *Milnor* v. *N. Y. & N. H. R. R. Co.*, 53 N. Y. 363.)

A judicial disposition of the issues raised and the application of principles invoked upon these motions must be limited to the conceded facts and their restricted scope prevents a more satisfactory determination and justifies. the observation that only a record by trial or stipulation will establish a basis for more complete and final adjudication.

*Fourth.* It is insisted that article 8-A of the Labor Law requiring the payment of wages at prevailing rates is indefinite.

The case of *Campbell* v. *City of New York* (244 N. Y. 317) holds otherwise and must be accepted as sufficient authority to sustain the act in this particular.

*Fifth.* It remains to consider the alleged violation of the commerce clause of the Federal Constitution.

The railroads in question are engaged in interstate commerce, and are thus subject to the Hours of Service Act. (U. S. Code, tit. 45, §§ 61–66.)

This act provides that it applies to common carriers engaged in the transportation of passengers or property by railroad from one State to any other State, and that the term "employees" as used in the act shall be held to mean persons actually engaged in or connected with the movement of any train. The act prescribes the maximum number of hours various employees may be required to remain on duty.

The Railway Labor Act (U. S. Code, tit. 45, §§ 151–163) for the purposes thereof defines the term "carrier" as including any carrier by railroad subject to the Interstate Commerce Act and the term "employee" as including every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission.

The act makes it the duty of carriers to exert every reasonable

effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes whether arising out of the application of such agreements or otherwise, in order to avoid interruption to commerce or to the operation of any carrier growing out of any disputes between the carrier and the employees thereof. Provision is made for boards of adjustment, a board of mediation and procedure for the settlement of disputes.

The Hours of Service Act applies to all employees of common carriers engaged in interstate commerce, where the employee is connected with the movement of any train. The Railway Labor Act, however, applies to all employees of interstate carriers who perform work defined as that of an employee in the orders of the Interstate Commerce Commission. These orders are very comprehensive and cover practically all employees of a railroad who might be engaged in elimination work. Agreements under that act may relate to rates of pay, rules and working conditions. Probably those agreements might regulate not only wages but hours of labor as well, if not inconsistent with the Hours of Labor Act. Working conditions certainly involve not only means, methods and physical conditions surrounding the work, but also as an incident the duration of continuing service, in the environment and by the means and methods adopted.

It appears, therefore, that Congress has entered the field of regulation of wages and hours of labor of employees engaged in the movement of trains, and of those engaged in railroad crossing elimination work who are employed by interstate carriers and subject to their general control.

The pleadings admit as to all plaintiffs herein the existence of agreements with employees in accordance with the provisions of the Railway Labor Act and that some of the work of crossing elimination will be required of such employees when plaintiffs are directed to perform such work by direct employment of labor.

As to such employees when so engaged, article 8-A is suspended and inoperative. (*Erie R. R. Co.* v. *New York*, 233 U. S. 671; *Erie R. R. Co.* v. *Williams*, Id. 685.)

Whether grade crossing elimination is strictly work which is directly a part of interstate commerce need not be determined. It is connected with interstate commerce, although primarily a local highway improvement. For that reason Congress would have the right to deal with railway employees engaged by an interstate carrier to do the work. (*Texas & Pacific Railway Co.* v. *Rigsby*, 241 U. S. 33; *Southern Railway Co.* v. *United States*, 222 id. 20.)

Grade crossing elimination work may be performed by con-

tractors and employees of the State. As to them the above acts would not apply, and article 8-A may be given effect.

The complaints herein state a cause of action and motion of defendant for judgment on the pleadings is denied, with ten dollars costs.

Orders may be entered enjoining and restraining the defendants and each of them during the pendency of the actions from enforcing compliance by the plaintiffs with any of the provisions of article 8-A of the Labor Law in connection with work for elimination of grade crossings so far as such provisions may be applicable to employees of the plaintiffs who are subject to and under the operation of the provisions and agreements thereunder of the Hours of Service Act and the Railway Labor Act enacted by the Congress of the United States.